Rachel S. Doughty (CA Bar No. 255904)
rdoughty@greenfirelaw.com
GREENFIRE LAW
1202 Oregon Street
Berkeley, CA 94702
Telephone: (828) 333-4703
Facsimile: (510) 900-6262

*Attorneys for Plaintiffs Story of Stuff
and Courage Campaign*

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY et al.,<br><br>    Plaintiffs,<br><br>    vs.<br><br>UNITED STATES FOREST SERVICE, et al.,<br><br>    Defendants. | Case No. 5:15−cv−02098−JGB−DTB<br><br>**DECLARATION (FIFTH) OF RACHEL S. DOUGHTY RE EXHIBITS TO AMICUS OPPOSITION BRIEF** |

I, Rachel Doughty, declare as follows:

1.      I am an attorney for Story of Stuff Project ("SOS") and Courage Campaign.  I have personal knowledge of the facts contained in this declaration, and if called upon to do so, could testify competently thereto.

2.      Attached hereto as **Exhibit 32** is a true and correct copy of the United States Forest Service ("USFS") Soil and Water Conservation Practices Handbook,

FIFTH DECLARATION OF RACHEL S. DOUGHTY
5:15−cv−02098−JGB−DTB

1

Chapter 2509.22 (Nov. 30, 2005) (available at:
www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5311717.pdf)(last
accessed May 19, 2016) (excerpts).

    **3.**    Attached hereto as **Exhibits 33** to **40** are true and correct copies of
records, described in subparagraphs to this paragraph 2 below, received by my
office on April 18, 2016, ultimately in response to a Freedom of Information Act
("FOIA") request submitted to the USFS on August 4, 2015, and assigned number
2015-FS-R5-04999-F.[1]

    a.  **Exhibit 33.** USFS, Internal Report "Arrowhead Springs Permit
Reissuance" (2015);

    b.  **Exhibit 34.** E-mail from Robert Taylor, Forest Hydrologist- Water,
Soils, Geology Program Manager, San Bernardino National Forest, to
Christopher Carlson, USFS, et al. (Apr. 21. 2015);

    c.  **Exhibit 35.** USFS, Internal Report "Resource Conditions and Effects
of Water Withdrawal (date unknown);

    d.  **Exhibit 36.** E-mail from Jody Noiron, Forest Supervisor, San
Bernardino National Forest, to Larry A. Lawrence, Natural Resource
Manager, Nestle Waters North America, Inc. (Jul. 9, 2015);

    e.  **Exhibit 37.** Letter from Christine A. Hill, District Ranger, San
Bernardino National Forest, to Larry A. Lawrence, Natural Resource
Manager, Nestle Waters North America, Inc. (Jul. 20, 2015);

    f.  **Exhibit 38.** Letter from Christine A. Hill, District Ranger, San
Bernardino National Forest, to Larry A. Lawrence, Natural Resource
Manager, Nestle Waters North America, Inc. (Jul. 27, 2015);

FIFTH DECLARATION OF RACHEL S. DOUGHTY
5:15−cv−02098−JGB−DTB

2

g. **Exhibit 39.** E-mail from Jody Noiron, Forest Supervisor, San Bernardino National Forest, to Jason Collier, USFS, and Christine Hill, District Ranger, San Bernardino National Forest (May 15, 2015);

h. **Exhibit 40.** USDA, Office of Inspector General, "Forest Service Administration of Special Use Program," Audit Report 08601-55-SF (Jun. 2011) (excerpts).

4. Attached hereto as **Exhibit 41** is a true and correct copy of *Envtl. Law Found., et al. v. State Water Res. Control Bd.*, Case No. 34-2010 80000583, (Cal. Superior Ct. Sac. July 15, 2014).

5. Attached hereto as **Exhibit 42** is a true and correct copy of *Del Rosa Mut. Water Co. v. D.J. Carpenter*, Case No. 31798 (San Bernardino Cty. Super. Ct., Oct. 19, 1931).

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.

Executed this 19th day of May, 2016.

/s/Rachel Doughty
Rachel Doughty (CA Bar No. 255904)

---

[1] These documents were released subsequent to the filing of Plaintiff Story of Stuff Project's related case, *Story of Stuff Project v. United States Forest Service*, 5:16-cv-00175-VAP-KK, which is also before this Court.

FIFTH DECLARATION OF RACHEL S. DOUGHTY
5:15−cv−02098−JGB−DTB

3



# FOREST SERVICE HANDBOOK
# SAN BERNARDINO NATIONAL FOREST (R5)
# SAN BERNARDINO, CA

## FSH 2509.22 – SOIL AND WATER CONSERVATION PRACTICES HANDBOOK

**Supplement No.:** 2509.22-2005-1

**Effective Date:** November 30, 2005

**Duration:** This Supplement is effective until superseded or removed.

**Approved:** GENE ZIMMERMAN        **Date Approved:** 11/29/2005
       Forest Supervisor

**Posting Instructions:** Supplements are numbered consecutively by Handbook number and calendar year. Post by document name. Remove entire document and replace with this supplement. Retain this transmittal as the first page(s) of this document.

| New Document | 2509.22-2005-1 | 33 Pages |
|---|---|---|
| **Superseded Document(s) by Issuance Number and Effective Date** | None | 0 Pages |

**Digest:** This supplement sets forth guidance for the delineation and management of Riparian Conservation Areas (RCAs) on the San Bernardino National Forest. This supplement works in concert with information contained in the 2005 southern California National Forests' revised land and resource management plans (forest plans).

Exhibit 32

4

**FSH 2509.22 – SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
ZERO CODE**

## 02 - OBJECTIVE

1. To present practical, clear guidance for identifying, describing, and delineating Riparian Conservation Areas.

2. To aid assessments of multiple-use capability and suitability in Riparian Conservation Areas.

3. To establish a process for analyzing riparian conditions for the benefit of riparian-dependent resources during management actions within Riparian Conservation Areas.

## 05 - DEFINITIONS

<u>Aquatic Ecosystems</u>. Stream channels, lakes, reservoirs, ponds, wetlands, vernal pools, seeps, springs, or estuary beds, the water itself, and biotic communities that occur therein.

<u>Bankfull</u>. The bankfull stage corresponds to the discharge at which channel maintenance is the most effective, that is, the discharge for moving sediment, forming or removing bars, forming or changing bends and meanders, and generally doing work that results in the average morphological characteristics of channels (Dunne and Leopold 1978). In channels with flood plains it can be defined as the incipient point of flooding when the channel flows out onto the floodplain.

<u>Channel Incision</u>. The condition in which rivers erode their beds and downcutting occurs.

<u>Duff and Humus</u>. Decomposed plant material that accumulates as a result of litter fall. Humus is the total of the organic compounds in soil exclusive of undecayed plant and animal tissues, their "partial decomposition" products, and the soil biomass. The term is often used synonymously with soil organic matter.

<u>Erosion</u>. The removal of soil by the action of water or wind. Erosion potential should be determined by a combination of the following: soil type, percent slope, percent ground cover, ground disturbance, distance from the stream, and amount and intensity of wind/rainfall. Soil stabilization is determined based on the above site factors.

<u>Litter</u>. Organic plant material that falls to the ground and is decomposing. Plant parts are easily identified and often species may also be identifiable.

<u>Percent Ground Cover</u>.  The percentage of ground surface covered by material (rocks, stumps, branches, leaves, litter, duff and living plants less than 5 feet tall.)

Exhibit 32

San Bernardino National Forest Supplement 2509.22-2005-1                    2509.22_Zero_code
EFFECTIVE DATE:  11/30/2005                                                  Page 5 of 33
DURATION:  This Supplement is effective until superseded or removed.

**FSH 2509.22 – SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
ZERO CODE**

Proper Functioning Condition. Riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to: dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality; filter sediment and aid floodplain development; improve flood-water retention and ground-water recharge; develop root masses that stabilize islands and shoreline features against cutting action; restrict water percolation; develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, water-bird breeding, and other uses; and support greater biodiversity (Bureau of Land Management 1998 and 1999).

Riparian Conservation Areas (RCAs). An area delineated next to water features requiring special management practices to maintain and/or improve watershed and riparian-dependent resource conditions (see chapter 2, section 2.5 for more information).

Riparian-Dependent Resources. Natural resources that owe their existence to the riparian area, such as fish, amphibians, reptiles, fairy shrimp and other aquatic invertebrates, plants, birds and mammals, as well as soil and water conditions.

Riparian Ecosystems.  The transition zone between the aquatic ecosystem and the adjacent terrestrial ecosystems identified by soil characteristics and distinctive vegetation communities that require free or unbound water (see chapter 2, section 2.2 for more information).

Slash.  Organic plant debris resulting from cutting of trees and shrubs. Includes limbs, twigs, and wood chunks.

Streambank.  The margins of a stream channel.

Stream Edge.  The high water line associated with "bankfull" discharge of perennial streams, or the mean high waterline of lakes and reservoirs.

Streams. All flowing natural waters.

Perennial – Streams that flow continuously throughout the year. They receive water not only from precipitation, but also from subterranean sources such as springs and seeps. They owe their permanency to the groundwater in the area adjoining the stream being at higher elevation than the streambed. Water flowing directly below the channel substrates (gravels) also serves to maintain riparian vegetative conditions.

Intermittent – Streams that flow only at certain times of the year, less than perennial, when they receive water from springs or from melting snow.

Exhibit 32

San Bernardino National Forest Supplement 2509.22-2005-1                    2509.22_1
EFFECTIVE DATE: 11/30/05                                                      Page 11 of 33
DURATION:  This supplement is effective until superseded or removed

**FSH 2509.22 – SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
CHAPTER 1 – IMPORTANCE OF RIPARIAN AREAS**

## 1.1 - RIPARIAN AREAS

The union of land and water creates a rich and complex ecology. Riparian areas collect and transport water, soil, and organic material from upslope and upstream. They comprise the most potentially productive and diverse components of forest and range ecosystems (section 2.2, exhibit 01). Fish, some wildlife, and some plant species depend on riparian areas for their existence. Riparian areas also provide sources of water for many hikers and backcountry users, as well as the primary setting for many activity specializations such as fishing and waterplay. They constitute the attractive landscape focal points for a majority of recreation uses.

This Forest Service Handbook (FSH) supplement provides guidance for field personnel who manage streams and riparian resources at the site-specific project level. Information contained herein is to be used together with standards and design criteria found in the 2005 southern California national forests' revised land and resource management plans (forest plans).

Riparian Conservation Areas (RCAs) include locations containing aquatic and terrestrial ecosystems -- lands adjacent to perennial, intermittent, and ephemeral streams as well as in and around meadows, lakes, reservoirs, ponds, wetlands, vernal pools, seeps, springs, and other water bodies. These are especially important areas because they are geographical areas where slope and fluvial processes are tightly inter-connected; terrestrial and aquatic systems strongly interact; and are important migration and travel corridors for many species. Land management activities have the potential to disrupt ecosystem processes and interactions resulting in adverse effects over the short and long term.

Riparian Conservation Areas are managed to maintain or improve conditions for riparian-dependent natural resources. Activities should be (a) neutral, (b) move the area closer towards the riparian area desired condition, or (c) move towards the riparian management objectives defined in the forest plans. Watersheds are managed to maintain functioning riparian areas and improve or restore degraded riparian areas to proper functioning condition for native populations of riparian-dependent species.

A Five-Step Project Screening process for RCAs describing how to delineate these areas was developed for part 3 of the forest plans and is referenced in standard S47 and Appendix E.

Guidance found in this FSH supplement is not meant to by-pass the interdisciplinary team (IDT) process involved in project environmental analysis or the protection of other resources. At the site-specific project level, Interdisciplinary Team (IDT) interactions, application of the forest plans Five-Step Project Screening process for RCAs, and use of this FSH supplement should lead to riparian-dependent resource maintenance and/or restoration.

Exhibit 32

San Bernardino National Forest Supplement 2509.22-2005-1                     2509.22_2
EFFECTIVE DATE:  11/30/05                                                    Page 17 of 33
DURATION:  This Supplement is effective until superseded or removed

**FSH 2509.22 – SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
CHAPTER 2 – IDENTIFICATION OF RIPARIAN CONSERVATION AREAS**

## 2.5 - RIPARIAN CONSERVATION AREAS (RCA)

An area delineated next to water features requiring special management practices to maintain and/or improve watershed and riparian-dependent resource conditions. Riparian Conservation Areas (RCAs) may overlap all land use designations. RCAs include the following areas:

1. Perennial streams, intermittent streams, aquatic ecosystems, meadows and any other areas with riparian conditions (lakes, reservoirs, ponds, wetlands, vernal pools, seeps, and springs), floodplains and inner gorges.
2. Suitable or occupied riparian habitat delineated for threatened, endangered, proposed, candidate, and/or sensitive species.

Perennial streams not having identifiable riparian vegetation should still be managed under RCA guidance. Ephemeral channels carry water to intermittent streams and should be protected to the extent that they do not contribute substantial amounts of sediment and other deleterious materials into the system due to management activities.

The forest plans environmental geographic information systems (GIS) layer and the species accounts, which are located in the forest plans reading room, display or describe water body types and special protection distances for any threatened, endangered, proposed, candidate, or sensitive species. This specific portion of the landscape is managed primarily to protect, maintain, or improve:

1. Water quality,
2. Site productivity,
3. Channel stability,
4. Riparian vegetation, and
5. Riparian-dependent species and habitat including: threatened, endangered, proposed, candidate and sensitive species, as well as many non-federally listed fish, wildlife, and plants

Instructions for project level delineation of RCAs are found in standard S47 and Appendix E in part 3 of the forest plans. Generally, all areas within a horizontal distance of approximately 328 feet (100 meters) from each edge of perennial streams and lakes/reservoirs or within approximately 98 feet (30 meters) of the edge of seasonally flowing/intermittent streams are delineated as RCAs. See this FSH supplement, chapter 3, for management techniques to use within RCAs.

Exhibit 32

8

San Bernardino National Forest Supplement 2509.22-2005-1     2509.22_3
EFFECTIVE DATE:  11/30/2005     Page 19 of 33
DURATION:  This Supplement is effective until superseded or removed.

**FSH 2509.22 —SOIL AND WATER CONSERVATION PRACTICES HANDBOOK**
**CHAPTER 3 – DESCRIPTION OF MANAGEMENT TECHNIQUES FOR**
**RIPARIAN CONSERVATION AREAS**

## 3.02 - OBJECTIVE

To provide guidance for the consistent delineation and management of Riparian Conservation Areas (RCAs) across the forest. This FSH supplement works in concert with information contained in the 2005 revised forest plans.

## 3.1 - MAJOR MANAGEMENT CONCERNS

Fish, other aquatic species, some wildlife, and some vegetation rely on water and riparian areas. Important management actions that may use riparian areas on National Forest System lands include timber, grazing, transportation, recreation, mining, and energy management. Understanding the major management concerns of these uses is needed to focus the riparian description on the most meaningful traits. The following list outlines some major management concerns of the riparian resources and uses:

   1.  Water - flood hazards, channel stability, erosion and sedimentation processes, water quantity and quality.

   2.  Fish and other aquatic species - food, habitat, channel structure, water quantity and quality.

   3.  Wildlife - food, habitat, water quantity and quality, microclimate, migration.

   4.  Vegetation - diversity of species, size classes, and distribution.

   5.  Timber - site productivity, access, pests.

   6.  Grazing - water supply, forage, microclimate.

   7.  Transportation - road location and channel crossing potential, flood hazards, construction materials.

   8.  Recreation - development potential, aesthetics, microclimate, flood hazards, fishing and hunting potential.

   9.  Mining - mineral deposits, access, water supply.

   10.  Energy - dam site potential, water supply.

## 3.2 - APPLICATION

Apply the Five-Step Project Screening process for Riparian Conservation Areas (RCAs) described in part 3 of the forest plans, standard S47 and Appendix E. In addition, use the

Exhibit 32

9

**FSH 2509.22 —SOIL AND WATER CONSERVATION PRACTICES HANDBOOK**
**CHAPTER 3 – DESCRIPTION OF MANAGEMENT TECHNIQUES FOR**
**RIPARIAN CONSERVATION AREAS**

applicable guidance found in this FSH supplement for site-specific management techniques when conducting activities within RCAs.

    1.  <u>Stream Protection Measures (Overview)</u>. A variety of forest management activities may occur within RCAs, both as planned activities and as emergency actions. The stream protection measures found in chapter 3, sections 3.21 – 3.38 of this FSH supplement apply to all RCAs. The measures are not intended to exclude streamside areas from management for forage, wildlife, water uses or other management activities. They are intended to assist in the design and implementation of projects that maintain and improve conditions for riparian-dependent resources.

### 3.21 - Stream Protection Measures General to ALL MANAGEMENT ACTIVITIES

1. *ALL APPLICABLE BEST MANAGEMENT PRACTICES (BMPs)* (USDA Forest Service 2000a) *SHOULD BE IDENTIFIED AND FOLLOWED IN ALL GROUND DISTURBING FOREST MANAGEMENT ACTIONS*, including in all contracts, operating plans, and work orders.
2. Prevent or limit activities that could cause channel aggradations or disaggradations (incisions).
3. Limit any activities on defined ground water recharge areas that may introduce contaminants to the groundwater, prevent or significantly reduce water infiltration, or that prevent groundwater from reaching wells.
4. Limit any chemical applications in or near RCAs and use containment methods that minimize risk of entry to surface and ground water.
5. Limit disturbance on incised slopes, meadows, streams, and rehabilitate damage caused by the activity to restore or improve riparian areas.
6. When stabilizing damaged streams, preferentially use methods that emphasize natural stream restoration designs and vegetative stabilization. Use native vegetation for stream restorations whenever possible (USDA Forest Service 2001).
7. Existing uses, activities, or occupancy within RCA's should be evaluated for risks or impacts and mitigated during special use renewal or re-issuance. If mitigation measures are not effective, reassess with the option to modify or eliminate the use, activity or occupancy when impacts are unacceptable.
8. Living native woody riparian vegetation should not be cut or removed, except during road, trail or facility maintenance and where riparian management objectives can be met.
9. Maintain vegetation where practicable to provide adequate shade to meet riparian objectives (based on the potential of the site).

### 3.22 - General to Any Vegetation Manipulation Projects (other than Prescribed Fire described in section 3.23)

A minimum protective ground cover objective shall be established and maintained **where natural conditions allow** throughout the year. Utilize section 3.22, exhibit 01, Minimum

Exhibit 32
10

San Bernardino National Forest Supplement 2509.22-2005-1                    2509.22_3
EFFECTIVE DATE: 11/30/2005                                                  Page 24 of 33
DURATION:  This Supplement is effective until superseded or removed.

**FSH 2509.22 —SOIL AND WATER CONSERVATION PRACTICES HANDBOOK**
**CHAPTER 3 – DESCRIPTION OF MANAGEMENT TECHNIQUES FOR**
**RIPARIAN CONSERVATION AREAS**

channels (also see Road Construction and Maintenance section 3.30 below). Existing skid roads, skid trails, and landings, assessed on a site-specific basis, should generally not be reconstructed for use, but should be re-vegetated after the activity has ended. Obliteration efforts may be necessary on such temporary facilities to promote rapid re-vegetation.

7. No new landings should be built in the RCA. Old landings should be properly drained and an acceptable ground cover established.  *Note:* If it would be environmentally favorable to use the landing once more instead of constructing a new one, then do so using special protective measures as specified by an earth scientist or biologist.

## 3.25 - Administration of Water Flow and Use

1. Review new special use permit applications for surface and ground water extraction and for transport of water across National Forest System lands and assess the potential impacts on aquatic and riparian ecosystems on or off the forest. Proponents should demonstrate that proposed development would meet the riparian management objectives. Apply forest plans standards S45, S46, S47, and S48 as applicable.

## 3.26 - Wildland Fire Suppression

1. *FIRE FIGHTER AND PUBLIC SAFETY WILL NOT BE COMPROMISED.*
2. Apply guidance found in FSM 5130 - Wildland Fire Suppression. Avoid construction of dozer and hand lines within RCAs whenever possible. When dozer lines must be constructed, use Minimum Impact Suppression Tactics (MIST), including raising the blade and walking dozers across riparian and aquatic areas (forest plans, part 3, Appendix B). Construct hand lines along the outer perimeter of riparian areas based on high severity fire behavior. Install erosion control measures to protect riparian areas.
3. Refer to "Guidelines for Aerial Applications of Retardants and Foams in Aquatic Environments" (USDA Forest Service 2000b) in forest plans, part 3, Appendix F regarding avoidance of the delivery of chemical retardant, foam, or additives to surface waters (also see MIST). Specifically, direct the use of fire retardant and Class A foam away from riparian areas. Avoid applying retardant and Class A foam to flowing watercourses.
4. A Resource Advisor should be assigned, at the discretion of the Line Officer, to wildland fires to assist in resource protection and considerations during suppression activities.
5. Apply "Guidelines for Emergency Consultation with National Oceanic and Atmospheric Administration (NOAA) Fisheries for Wildland Fires" (National Marine Fisheries Service 2002) and the U.S. Fish and Wildlife Service Guidelines for Emergency Wildfire Suppression.
6. Consider life cycle and habitat requirements of threatened, endangered, proposed, candidate, and sensitive species when developing suppression strategies and tactics in RCAs. Tactics that may affect these species and habitats can include line construction,

Exhibit 32

11

San Bernardino National Forest Supplement 2509.22-2005-1          2509.22_3
EFFECTIVE DATE:  11/30/2005                                        Page 30 of 33
DURATION:  This Supplement is effective until superseded or removed.

**FSH 2509.22 —SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
CHAPTER 3 – DESCRIPTION OF MANAGEMENT TECHNIQUES FOR
RIPARIAN CONSERVATION AREAS**

10. A biologist, or designee, should be present when heavy equipment is used in a flowing channel. The contracting officer/inspector must notify the biologist at least three days prior to initiation of construction activities to allow adequate time for site visits and surveys.

11. Implement all applicable Best Management Practices (BMPs) (see section 3.21), especially:

    a. Post-storm inspections and maintenance,
    b. Identification and correction of serious road drainage problems that may contribute to the degradation of RCAs. Riparian resources should receive high priority in road operations and maintenance,
    c. Regulation of traffic during wet periods to prevent damage to riparian resources (wet weather closures). Establish and document the purpose of each road within the forest road management system,

12. Monitor these actions and use monitoring results to bring operations into compliance with conservation objectives and the forest plans standards. Monitoring would verify the implementation and effectiveness of the above actions to ensure they comply with management objectives.

## 3.31 - Lands and Special Uses

Land Exchanges, Acquisitions and Sales:

1. All proposed land transactions should include a full evaluation of riparian and aquatic resources on Federal lands, and if necessary, private parcels.

Rights-of-way:

1. All proposed rights-of-way grants should include a full evaluation of riparian and aquatic resources on Federal lands, and if necessary, in private parcels.
2. Locate all new rights-of-way grants on private lands outside RCAs to the extent possible.

Special Uses:

1. In accordance with FSH 2709.11, schedule to review all surface water diversions to ensure compliance with applicable environmental laws such as the Endangered Species Act, Safe Drinking Water Act, Clean Water Act, and so forth.
2. Ensure that proof of water right is established prior to issuing or re-issuing Special Use Permits (S.U.P.).

Exhibit 32
12

**FSH 2509.22 —SOIL AND WATER CONSERVATION PRACTICES HANDBOOK
CHAPTER 3 – DESCRIPTION OF MANAGEMENT TECHNIQUES FOR
RIPARIAN CONSERVATION AREAS**

3. Where water use is part of a permit or is evident ensure that all S.U.P. applicants have secured the appropriate U.S. Army Corps of Engineers 404 permit, California Department of Fish and Game 1601 Stream Alternation Agreement, and California Regional Water Quality Control Board 401 Certification before issuing a S.U.P. that would result in channel alteration.

4. When issuing S.U.P.s recognize and incorporate traditional uses (for example: Native American gathering of basketry material) and identify possible effects on RCAs and threatened, endangered, proposed, candidate and sensitive species and habitats.

## 3.32 - Administration of Prospecting and Mining

1. New mineral activities that are likely to cause significant disturbances to surface resources and any modifications, renewals, and reauthorizations of existing approved plans of operation, contracts, or permits implement the forest plans standard S47 and Appendix E.

2. Use forest plans database to identify which mining areas on the forest need special attention. Include review of Plans of Operation (P.O.O.) to ensure that protection of RCAs and riparian resources is provided.

3. Require P.O.O.s for operations and reclamation activities and bonds for all mineral operations that are likely to cause significant surface disturbance within riparian habitat where threatened, endangered, proposed, candidate, and sensitive species may be affected. Plans of operation in threatened, endangered, proposed, candidate, and sensitive habitat should include closures during breeding seasons if necessary.

4. Locate structures, support facilities, and roads outside RCAs where practicable. Where no alternative to placing facilities in RCAs exists, locate them in a way to minimize adverse impacts. Road construction should be kept to the minimum necessary for approved P.O.O.s. Construct and maintain such roads to minimize damage to RCAs and riparian resources. When a road is no longer required, P.O.O.s should include instructions to the miner regarding road obliteration and rehabilitation and reflect that Forest Service would conduct or oversee the roadwork.

5. Avoid the placement of mine tailings, soil and overburden, similar materials or wastes, and sanitary waste facilities in RCAs. Where these restrictions are not feasible, design the activity to eliminate discharges that could cause detrimental effects. Monitor facilities and mining residue in or adjacent to RCAs to ensure discharges are not causing detrimental effects. When detrimental effects are identified take actions to bring them into conformance.

6. For leasable minerals, avoid surface occupancy within RCAs where contracts and leases do not exist. Modify or amend existing operating plans where possible to move towards the riparian desired conditions described in part 1 of the forest plans.

7. Sand and gravel extraction under the Minerals Materials Act should be approved in RCAs if the project follows forest plans standard S47 and Appendix E. Consider only permitting sand, river rock, and gravel mining and extraction within RCAs if no

Exhibit 32

# Arrowhead Springs

## Permit Reissuance

### 2015

**What is permitted?**

Permits have been issued and reissued since 1931 and have historically been for occupancy, not volume or value (appropriation) of water.   This has raised much controversy in the past, including OIG audits and letters to the Chief.  The agency has debated this issue on more than one occasion, including a decision by the Chief in 1977 that the permit to AH is for occupancy, not value of the water taken.

**Whose water is it anyway?**

In 1998, efforts were made to prove that the water taken by AH springs belongs to the USA and is in fact ground water, not surface water.  Verification of the State water rights database (2015) confirms that the water taken by Arrowhead Springs is reported as groundwater.  Surface rights, which are appropriated, have not been identified in the area.  Under California Water Law, groundwater is under the control of the overlying landowner, in this case the San Bernardino National Forest.  Overlying land owners may extract percolating ground water and put it to beneficial use without approval from the State Board or a court.  California does not have a permit process for regulating the use of ground water, although Southern California counties do require that the use of groundwater be reported.  A Statement of Groundwater Use does not confirm a water right, but it does document the use by persons or organizations that divert and use ground water.  The Division of Water Rights staff does not analyze the contents of a Statement, or research the legal water right status of the diverter at the time of receipt.

**What decision space do we have?**



(b)
(5),Deliberative
Process Privileg

**Current permit status**

The permit to AH is expired (1990's) and the status is the same as all the other expired permits on the Forest.  The permit holder has not received a notice of noncompliance and is therefore in

Exhibit 33

14

good standing.  Several efforts have been made to complete NEPA and reissue the expired permit but a baseline condition has not been established and studies have not been completed.

The main message here is that AH is in good standing and has not had administrative action taken against them.  Like all other permits on the Forest, unless we take administrative action, they may continue operating under their expired permit until we issue them a new permit.

**Permit Reissuance**

EA/EIS

The existing baseline condition has not been established.  This is an important step to get NEPA started.  Without this step, NEPA will be much harder to implement and complete.  Given the complexity and sensitivity surrounding this permit, the Forest may want to seek advice from the Regional Office for hydrology and geology support.

- Good information currently exists from the ground water studies completed in the same general area for the Arrowhead Tunnels project.
  - o Inquiries made of Michelle Bearmar and Neil Berg indicated that little focus was placed on the Arrowhead Springs fault area because little to any affects was seen in this area relative to Tunnel construction.
- Inquiries to Minerals and Geology Management (WO) leaders [Chris Carlson, Melody Holm] brought offers of help and some limited/simplistic write-ups conducted by Margie Zhang.

**Steps forward**

- Identify the resource needs and concerns and dedicate an ID Team
- Complete internal scoping and initiate NEPA
- Seek council from the RO

**\*We need ID Team support to complete these steps**

Exhibit 33

| | |
|---|---|
| **From:** | Taylor, Robert G -FS |
| **To:** | Carlson, Christopher -FS |
| **Cc:** | Norman, Sue -FS |
| **Subject:** | RE: Surface Water Right for Arrowhead Spring |
| **Date:** | Tuesday, April 21, 2015 12:15:00 PM |
| **Attachments:** | image006.png |
| | image007.png |
| | image008.png |

To my knowledge, there are no surface water rights.  In conversations with Nestle, they also state that they are pumping groundwater and report there usage to the State because of the requirements for groundwater extraction in certain southern California counties.

It isn't one spring either.  The State database shows multiple groundwater extractions that are on the Forest, and others that are off Forest. [Best guess from GIS mapping; some of the "Off Forest" ones could be on]

| On Forest | Diversion Site Name |
|---|---|
| G362800 | No.10 |
| G362856 | No.12 |
| G362894 | No.11 |
| G360476 | No.1 |
| G360477 | No.2 |
| G360482 | No.8 |
| G362857 | No.7 |

| Off Forest | Diversion Site Name |
|---|---|
| G360478 | No.3 |
| G360480 | No.7-A |
| G360481 | No.7B |
| G361986 | No.7C |

The Forest has one appropriative right to a spring, A006108, that we acquired from Caltrans., in the upper Strawberry Creek watershed. Our spring is not gaged, though we have it listed as 10.1 AFy for wildlife enhancement.

 

**Robert G. Taylor, P.G.**
**Forest Hydrologist - Water, Soils, Geology Program Manager**

**Forest Service**
San Bernardino National Forest, Supervisor's Offie

p: 909-382-2660
c: 909-693-2875
rgtaylor@fs.fed.us

602 S. Tippecanoe Ave.
San Bernardino, CA 92408
www.fs.fed.us


Caring for the land and serving people

Exhibit 34

16

Resource Conditions and Effects of Water Withdrawal

Based on several weeks of time of studying the issue for many years as Forest Biologist for potential permit renewal, Land Management Plan analysis, Potential City Development of the Campus Crusade property, and as lead Forest Service fish and wildlife biologist for the Arrowhead Tunnel Project, which included Strawberry Creek.

- A comparison of Strawberry Creek to dozens of front country streams seems to clearly show the difference in streams with natural flows in the summer months. Strawberry wetted area seems to be much smaller and flows are much less than in comparable size watersheds that are not unnaturally diverted/dewatered.

- We are really dealing with groundwater (including any historical surface flow) withdrawal at a very high rate. The Forest, Regional Office and OGC all concurred in the late 90's that the so called "spring" water was really groundwater. With the deep boreholes and horizontal wells, they are able to effect a large area of groundwater. The topo map shows a lot of wells on private land that appear to tap some of the same groundwater potentially and those might be useful for monitoring/understanding.

- The operation of these wells and boreholes is exactly the opposite of the way the Tunnel Project was handled by the FS to protect the groundwater and surface resources. Arrowhead/Nestle is doing everything possible to get as much groundwater as possible to flow through their pipeline. They have created and are maintaining them to get as much flow as possible. Some boreholes are large enough to stand up in and up to 500 feet deep. We made MWD spend millions grouting and chasing small leaks compared to this.

- The landslide below Rim Forest is potentially having a great effect on the East Fork of Strawberry and there is talk of diverting some of the runoff that normally go to Strawberry into the Mojave River watershed to protect the community form additional landslides. This needs to be factored in and understood in relation to the permit.

- Original water rights appear to be based on removal of surface water at the base of the mountain on or near the Campus Crusade Property. It was reportedly for so much cold water, versus the warm water which was also present in the area due to the thermal springs. Not sure if the original diversions and rights were for Waterman Canyon, West Twin, East Twin, Coldwater, or Strawberry, a combination or what. The springs in their current location on National Forest were developed in the 30's to 60's I believe.

- Alternatives appear to exist to remove the water much lower elevation nearer to the Campus Crusade property. This would allow delivery of the water in a natural process and pick up after a majority of the stream has been watered. It would be worth a temporary loss of habitat due to development of a new source at the bottom, to let the water move through the system naturally. The Riparian will recover quickly if there is natural groundwater and surface water conditions.

Exhibit 35

17

- Hydro and Fisheries Studies performed for Nestle/Perrier in the early 2000's were done to satisfy the Proponent and did not adequately address the issues and relationships needed by the Forest Service or Fish and Game (Robin Maloney Rames, Raul Rodriguez). The Studies did acknowledge the removal of up to 400 acre feet per year in wet years. The studies dealt with fish and wildlife as a biomass issue and not long-term use and survivability and recovery of dace and other species.

Exhibit 35

18

Ontario, CA
91761
ATTN: Larry Lawrence


As soon as I receive the invoice and instructions I will process for payment.


Thank you,
Larry A. Lawrence

abcd Nestlé Waters North America

Natural Resource Manager
Ph: 714-812-4814

This email message and any attachments are intended only for the use of the addressee(s) named above.  This message may be an attorney–client communication, and, as such, is privileged and confidential.  If you are not the intended recipient any dissemination, distribution or copying is strictly prohibited.  If you receive this email message in error, please immediately notify the sender by replying to this message via email or telephone.  Thank you.


---

**From:** Noiron, Jody -FS [mailto:jnoiron@fs.fed.us]
**Sent:** Thursday, July 09, 2015 1:24 PM
**To:** Lawrence,Larry,ONTARIO,Manufacturing
**Cc:** Rider, Joshua - OGC; Noiron, Jody -FS; Hill, Christine A -FS
**Subject:** Tax ID number

Hi Larry – Last Friday you told Christine and Jason you would provide Nestle's Tax ID number (TIN) so Jason could process the Cost Recovery agreement.  As you are aware the TIN is required to process the agreement.  Jason  tried to followup with you several times this week to get this required information from you. As of yesterday we still had not received the information from you so Al Colby contacted you and you replied to him that you would provide the TIN today.  Please know that if we do not receive the TIN by COB today the Forest Service will be considering curtailing Nestle's activities on the Forest until the re-issuance process is completed and a decision rendered regarding permit re-issuance.   We do hope we receive the TIN today.   Thanks



**Jody Noiron**
**Forest Supervisor**

**Forest Service**
**San Bernardino National Forest**

p: 909-382-2710
c: 626-590-7628
f: 909-383-5504
jnoiron@fs.fed.us

602 South Tippecanoe Avenue
San Bernardino, CA 92408
www.fs.fed.us

**Caring for the land and serving people**

Exhibit 36

19

**USDA** | United States Department of Agriculture | Forest Service | San Bernardino National Forest Supervisor's Office | 602 South Tippecanoe Ave. San Bernardino, CA 92408 Phone: 909-382-2600 Fax: 909-383-5770 CRS: 1-800-735-2922

File Code: 2700
Date: July 20, 2015

Larry A. Lawrence
Natural Resource Manager
Nestle Waters North America Inc.
5772 East Jurupa Street
Ontario, CA 91761

Dear Mr. Lawrence,

Thank you for providing the signed cost recovery agreement, Standard Operating Procedures for spring sanitation, and draft plan view drawings during our meeting on 7/1/2015 at the Front Country District Office. The information provided does not represent a clear understanding of the permitted improvements pertaining to your authorization that we requested on two separate occasions (May 11, 2015 and June 18, 2015). This is our final attempt to obtain necessary, complete and accurate documentation pertaining to your permitted use on the San Bernardino National Forest.

Nestle shall provide:
1)  A detailed narrative description pertaining to existing infrastructure and access pertaining to the authorized use i.e., miles of pipeline, number of wells, tunnels, and springs.
2) Final fully detailed design specifications of ancillary features including cross –section views, lengths, and depths for tunnels and all other features.
3) All pieces of documentation shall be cross referenced including maps, pipeline survey drawings, and design specifications of existing features so we know exactly in detail "what it is" and where it is located topographically on the landscape.

Please provide this information by 7/29/2015. We will not entertain further submittal of piecemeal cursory documentation. The information to be provided shall be clearly articulated, complete and well organized to facilitate a clear picture and understanding of what Nestle is requesting for permit re-issuance. This information will facilitate the environmental analysis process. If the information is not provided by this time, the Forest will consider curtailing Nestle's activities on the Forest until the re-issuance process is completed and a decision rendered regarding permit re-issuance.

The Forest remains committed in the permit re-issuance process for this permit. If you have any questions, please contact Christine Hill at 909-382-2860 or cahill01@fs.fed.us.

Sincerely,

Exhibit 37



**Caring for the Land and Serving People**


Printed on Recycled Paper

20

*/s/ Christine A. Hill*
CHRISTINE A. HILL
District Ranger

Attachments

Cc: Jody Noiron, Forest Supervisor
    Joshua Rider, Office of General Counsel

Exhibit 37

21

| | | | |
|---|---|---|---|
| **United States Department of Agriculture** | **Forest Service** | **San Bernardino National Forest Supervisor's Office** | **602 South Tippecanoe Ave. San Bernardino, CA 92408 Phone: 909-382-2600 Fax: 909-383-5770 CRS: 1-800-735-2922** |

File Code: 2700
Date: July 27, 2015

Larry A. Lawrence
Natural Resource Manager
Nestle Waters North America Inc.
5772 East Jurupa Street
Ontario, CA 91761

Dear Mr. Lawrence,

We write to follow up on our ongoing discussions regarding the re-issuance of Nestle Waters' Special Use Permit (CAJ7285) for occupancy of lands of the San Bernardino National Forest.

We appreciate your completion of the Cost Recovery Agreement and submission of the required banking information. During our most recent meeting, July 1st at the Front Country District Office, you also provided us with 1) Standard Operating Procedures (03.02.01-05) for spring and pipeline sanitation, pressure reducing valves and air vac maintenance, 2) draft plan view drawings of Nestle's spring boxes, tunnel 3 entry, typical air vac and underground vaults along the buried pipeline, and 3) a draft location map illustrating pipeline, helicopter landing areas, spring vaults, and access path. These are being reviewed by Forest staff.

While we appreciate the information Nestle has provided the Forest thus far, it does not represent a clear and complete understanding of your permitted improvements and uses which is a necessity for permit re-issuance and a threshold issue. I would like to draw attention to the fact that we have requested this from you on several previous occasions since we agreed to take up permit re-issuance at Nestle's request including meetings with you on February 27, March 16, April 28 and July 1; and in correspondence dated February 27, March 18, May 11 and June 18. The Forest's records have been reviewed and they do not contain the pertinent information. The information must either be provided by Nestle, or if it is currently unavailable, it must be generated.

To clarify, the information required is:

1) A **detailed narrative description** that is complete and clearly articulates existing infrastructure and access pertaining to the authorized use i.e., miles of pipeline, number of wells, tunnels, and springs. Details shall include complete measurements and dimensions including length, width, height and depth of all features. The description should be well organized to facilitate a clear picture and understanding of what Nestle is requesting for permit re-issuance.

Exhibit 38



Printed on Recycled Paper 

22

2) Other than pipeline and spring sanitation procedures, which were provided in great detail, identify other **routine operations and maintenance and access** needs in the same level of detail. Expected numbers of helicopter flights and frequency, and whether any work is to be done on landing areas.

3) **Signed pipeline as built survey drawing** validating authenticity; the as built survey received does not contain signature and appears to be draft.

4) Final fully detailed **design specifications of pipeline and ancillary features** including cross –section views and complete measurements for all other features.

5) **Final Plan View maps** of ancillary features, the plan maps received are labeled "draft".

6) All pieces of documentation should be cross referenced including maps, pipeline survey drawings, and design specifications of existing features so we know exactly in detail "what it is" and where it is located topographically on the landscape.

Please provide this information by 8/10/2015.  If Nestle cannot provide the documentation by this time, please explain why, if it will take more time to gather or whether some of the information is simply not in your files either. We can then determine how best to obtain the information.

As discussed with you in meetings and in repeated letters and email, this information is required to initiate permit re-issuance. If Nestle wants to re-authorize their use of National Forest System lands, this level of detailed documentation must be received. If the information continues to be unavailable, the Forest will consider curtailing Nestle's activities on the Forest until the required information is available and the re-issuance process can proceed.

The Forest remains committed in the permit re-issuance process for this permit.  If you have any questions regarding the requested information, please contact Christine Hill at 909-382-2860 or cahill01@fs.fed.us.

Sincerely,

*/s/ Christine A. Hill*

CHRISTINE A. HILL
District Ranger

Attachments

Cc: Jody Noiron, Forest Supervisor
    Joshua Rider, Office of General Counsel

Exhibit 38

23

| From: | Noiron, Jody -FS |
|---|---|
| To: | Collier, Jason P -FS; Hill, Christine A -FS |
| Cc: | Exline, John -FS; Colby, Al -FS; Miller, John -FS |
| Subject: | RE: cucamonga county water |
| Date: | Friday, May 15, 2015 2:36:02 PM |
| Attachments: | Follow-up Letter.msg |
| | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Oh – you reminded me, thx – had a vm today from Larry, they received our letter and they are working on the info we requested. I attached the letter we sent in case some of you have not seen it – recaps our attny meeting and gives them due dates.  Larry  asked that I call him, have not had a chance to do that yet today. Will let you know how that goes.

Hope everyone has a nice weekend and thanks for all your good work this week – appreciated !



**Jody Noiron**
**Forest Supervisor**

**Forest Service**
**San Bernardino National Forest**

p: 909-382-2710
c: 626-590-7628
f: 909-383-5504
jnoiron@fs.fed.us

602 South Tippecanoe Avenue
San Bernardino, CA 92408
www.fs.fed.us

**Caring for the land and serving people**

---

**From:** Collier, Jason P -FS
**Sent:** Friday, May 15, 2015 2:25 PM
**To:** Noiron, Jody -FS; Hill, Christine A -FS
**Cc:** Exline, John -FS; Colby, Al -FS; Miller, John -FS
**Subject:** RE: cucamonga county water

I'm thinking that is the next step given we haven't been successful in getting them to come to the table. I'll start working on a draft for Christine.

I have also been emailing Larry with Arrowhead once a week offering to work with them on the wording for the cost recovery so we can get it signed & in process with ASC; he has not answered to date.

**Jason Collier**
**Lands & Recreation**

Exhibit 39

24



**Forest Service**
**San Bernardino National Forest**
**p: 909-382-2869**
**jpcollier@fs.fed.us**

602 S. Tippecanoe Ave.
San Bernardino, CA 92408
www.fs.fed.us



**Caring for the land and serving people**

---

**From:** Noiron, Jody -FS
**Sent:** Friday, May 15, 2015 2:21 PM
**To:** Collier, Jason P -FS; Hill, Christine A -FS
**Cc:** Exline, John -FS; Colby, Al -FS; Miller, John -FS
**Subject:** RE: cucamonga county water

thanks Jason  - has the District sent them a letter (yet)?



**Jody Noiron**
**Forest Supervisor**

**Forest Service**
**San Bernardino National Forest**

p: 909-382-2710
c: 626-590-7628
f: 909-383-5504
**jnoiron@fs.fed.us**

602 South Tippecanoe Avenue
San Bernardino, CA 92408
www.fs.fed.us

**Caring for the land and serving people**

---

**From:** Collier, Jason P -FS
**Sent:** Friday, May 15, 2015 2:12 PM
**To:** Hill, Christine A -FS
**Cc:** Noiron, Jody -FS; Exline, John -FS; Colby, Al -FS; Miller, John -FS
**Subject:** cucamonga county water

Hi Christine,

FYI. I'm continuing to reach out to CCW and ask for a meeting to discuss the permit.

jason

Exhibit 39



**Jason Collier**
**Lands & Recreation**

**Forest Service**
**San Bernardino National Forest**

**p: 909-382-2869**
**jpcollier@fs.fed.us**

602 S. Tippecanoe Ave.
San Bernardino, CA 92408
www.fs.fed.us

**Caring for the land and serving people**

---

**From:** Collier, Jason P -FS
**Sent:** Friday, May 15, 2015 1:52 PM
**To:** 'adrianav@cvwdwater.com'
**Subject:** meeting with CCWD

Hello Adriana,

Thank you for speaking with me today and for relaying the information to Mr. Diggs. I am hoping to meet with him as soon as reasonably possible to discuss the permit.

Have a great weekend.

jason



**Jason Collier**
**Lands & Recreation**

**Forest Service**
**San Bernardino National Forest**

**p: 909-382-2869**
**jpcollier@fs.fed.us**

602 S. Tippecanoe Ave.
San Bernardino, CA 92408
www.fs.fed.us



**Caring for the land and serving people**

Exhibit 39

26





**U.S. Department of Agriculture**

**Office of Inspector General**

# Forest Service
# Administration of Special Use Program

Exhibit 40

**Audit Report 08601-55-SF**
**June 2011**

27




United States Department of Agriculture

Office of Inspector General

Washington, D.C. 20250



DATE:   June 16, 2011

AUDIT
NUMBER:   08601-55-SF

TO:   Thomas L. Tidwell
Chief
Forest Service

ATTN:   Donna M. Carmical
Chief Financial Officer

FROM:   Gil H. Harden   /s/
Assistant Inspector General
for Audit

SUBJECT:   Forest Service Administration of Special Use Program

This report presents the results of our review of the Forest Service's (FS) Special Use Program. FS' written response to the draft report is included at the end of the report, with excerpts and the Office of Inspector General's (OIG) position incorporated into the relevant sections of the report. Based on the written response, we have accepted FS' management decision for all the report recommendations, except for Recommendations 3, 4, 8, and 13. We will be able to accept your management decision for the remaining recommendations when you provide us with additional information, as outlined in the OIG Position section of the report.

In accordance with Departmental Regulation 1720-1, please furnish a reply within 60 days, describing the corrective actions taken or planned, and timeframes for completion of the recommendations for which management decision have not been reached. Please note that the regulation requires a management decision to be reached on all recommendations within a maximum of 6 months from report issuance. Follow your internal agency procedures in forwarding final action correspondence to the Office of the Chief Financial Officer.

We appreciate the assistance your staff provided to our auditors during our review.

Exhibit 40

28

## Table of Contents

**Executive Summary** ...............................................................................1

**Background & Objectives** .....................................................................5

   **Background** ............................................................................................5

   **Objectives** .............................................................................................6

**Section 1:  Management Controls Need Improvement** .......................7

   **Finding 1** ................................................................................................7

   **FS Needs To Resolve Resource Shortfalls in the Special Use Program** .........7

      **Recommendation 1** ..........................................................................9

      **Recommendation 2** ........................................................................10

   **Finding 2** ..............................................................................................11

   **FS Regions Need to Update Minimum Land Use Fees to Reflect Fair Market Value** ...............................................................................................11

      **Recommendation 3** ........................................................................14

      **Recommendation 4** ........................................................................14

      **Recommendation 5** ........................................................................15

      **Recommendation 6** ........................................................................15

**Section 2:  Monitoring Special Use Authorizations** ...........................16

   **Finding 3** ..............................................................................................16

   **FS Needs to Develop a Risk-Based Approach System for Inspecting Special Use Authorizations** ...............................................................................16

      **Recommendation 7** ........................................................................18

      **Recommendation 8** ........................................................................19

      **Recommendation 9** ........................................................................19

   **Finding 4** ..............................................................................................19

   **FS Needs to Prepare Communication Site Management Plans** ....................19

      **Recommendation 10** ......................................................................21

      **Recommendation 11** ......................................................................21

      **Recommendation 12** ......................................................................21

**Section 3:  Controls** ..............................................................................22

Exhibit 40

29

**Finding 5** .................................................................................................**22**

**FS Needs To Develop and Implement Procedures for Dealing with Expiring and Expired Authorizations** ..................................................**22**

    **Recommendation 13** .....................................................................**24**

    **Recommendation 14** .....................................................................**24**

    **Recommendation 15** .....................................................................**24**

    **Recommendation 16** .....................................................................**25**

**Finding 6** .................................................................................................**25**

**FS Needs to Improve SUDS to Ensure the Reliability of its Data** ................**25**

    **Recommendation 17** .....................................................................**27**

    **Recommendation 18** .....................................................................**28**

    **Recommendation 19** .....................................................................**28**

    **Recommendation 20** .....................................................................**28**

    **Recommendation 21** .....................................................................**29**

**Scope and Methodology** ..........................................................................**30**

**Abbreviations** .........................................................................................**32**

**Exhibit A:  Summary of Monetary Results** ...............................................**33**

**Exhibit B:  Use Fees Do Not Reflect Fair Market Value Proposed Market Survey Rates Based on OIG Calculations (2003-2009)** .........................**34**

**Exhibit C:  Use Fees Do Not Reflect Annual Index of Fair Market Value Calculation of Minimum Use Fee – Annual Index (2005-2009)** .........................**39**

**Exhibit D:  Inaccurate Information Found in SUDS** .........................**40**

**Exhibit E:  Sites Visited** ..........................................................................**42**

**Agency's Response** ..................................................................................**43**

Exhibit 40

30

# Section 3:  Controls

## Finding 5

## FS Needs To Develop and Implement Procedures for Dealing with Expiring and Expired Authorizations

When FS authorizes a special use of national forests, the agency establishes a period for that use, and eventually that authorization will expire.  For instance, FS might authorize a company to tap spring water for bottling purposes for 30 years—when those 30 years have passed, the company must either seek to renew the authorization or restore the land to its previous condition.  We found, however, that more than 3,500 special use authorizations have expired but are still being treated as active.[34]  Many of these expired, but active, authorizations ended more than 3 years ago, and some even ended decades ago.  This occurred because FS did not have effective procedures for dealing with expiring authorizations; FS officials also stated that they lack the staff to address the backlog.  In particular, since national forests do not consider the Special Use Program to be a priority, they do not allocate the required specialists to conduct the NEPA reviews necessary for authorization renewals (see Finding 1).  Continuing to allow authorization holders to carry expired authorizations unnecessarily encumbers FS lands and restricts the land's availability for other public uses.

The recommended maximum term for authorizations ranges from 1 to 30 years for most land uses.[35] When an authorization is due to expire, the authorization holder is required to notify the authorizing officer concerning whether the authorization holder desires FS to reissue the authorization.  Prior to renewing the authorization, the authorizing officials will determine "if the project or facility is still being used for the purpose previously authorized and is being operated and maintained in accordance with all the provisions of the authorization."[36]

When FS officials reissue an authorization, they are required to perform an environmental assessment.  Under NEPA, FS must conduct environmental assessments of the nature and importance of the physical, biological, social, and economic effects of a proposed action and its reasonable alternatives where conclusions are reached about significant effects on the human environment.[37]  This requirement applies to any type of special use authorization FS issues.

Based upon our review of how FS was handling expiring authorizations in Regions 2 and 5, we found that authorizing officials were no longer requiring authorization holders to notify FS in writing about their interest in renewing the authorization.  Instead, FS would continue annually billing the authorization holder as if the authorization had not expired.  If FS received a payment, it considered the authorization as a "tenancy at will" agreement for the upcoming year and

---

[34] In the Special Use Data System (SUDS), we identified 3,523 out of 9,475 expired special use authorizations that were active because the bills were being paid by the authorization holder.  For the remaining 5,952 expired authorizations with uncollected fees, we were unable to determine the status due to the unreliable data in SUDS (see Finding 6).
[35] FSH 2709.11, Chapter 10, dated May 12, 2004.
[36] 36 CFR 251.64 Renewals, dated July 1, 2007.
[37] FSM 1950 – Environmental Policy and Procedures, dated July 24, 2008.

Audit Report 08601-55-SF

22

Exhibit 40
31

considered the expired authorization as being active even though the agency did not conduct an environmental analysis.  However, if FS did not receive a payment, authorizing officers would consider the authorization inactive, but they would not take steps to cancel it.  This process almost guarantees perpetual re-authorization so long as the authorization holder continues to pay the land use fee.  It also has the effect of allowing FS to circumvent NEPA requirements since the authorization continues without the required environmental assessment being conducted.

When we spoke to FS officials about how the agency was allowing authorizations to perpetually renew so long as payment was received, they explained that they followed an Office of the General Counsel (OGC) guideline, which states that an expired special use authorization holder may be treated either as a "tenant at will" or as a "trespasser."  OGC further elaborated by saying that, if authorization holders pay their annual bill, then they should be treated as a "tenant at will"—otherwise they should be considered "trespassers."  OGC concluded, however, that "administering expired special use authorizations is not an ideal situation. Programmatically and legally, the agency is better off administering a current authorization."[38]  The guideline also stated that the intent was not to allow the perpetual renewal of expired authorizations, but to provide FS a temporary measure to address the expired authorizations.

However, we found that FS' current method of administering its expired special use authorizations did not address the backlog of expired authorizations.  For one site we visited, a bottling company is still using a water authorization that expired more than 20 years ago. The company approached FS for a renewal multiple times, and even offered to pay for the NEPA assessment itself, but FS told the company that it could not process the renewal due to a backlog of expired authorizations and other priorities.

We discussed with authorizing officials why they were not renewing these expired authorizations. They explained that they lacked the specialists they needed to perform all the NEPA reviews necessary for thousands of expired authorizations.  While authorizing officials can conduct the required NEPA reviews themselves, especially if there has been no dramatic change in conditions, they were reluctant to make this assessment due to their lack of expertise in the area.  Even though FS can collect cost recovery fees from the authorization holder to conduct the NEPA review, each national forest has a limited number of specialists who are able to perform the function, or to review the work of other, independent NEPA reviewers.  FS officials also stated that, given their limited resources, they emphasized new special use proposals and processing applications because they have deadlines for performing these tasks.  They regarded reviews of expiring authorizations as a lower priority, and accordingly focused fewer resources on them.

FS Washington Office special use staff told us that they were aware that some regions lacked sufficient resources to adequately administer expiring Special Use Program authorizations.  They stated that they would develop procedures to ensure a special use applicant is aware that when the authorization is about to expire that they must notify FS of their intent to continue the authorization or terminate the usage.

---

[38] "Administration of Expired Special Use Authorizations for Rights-Of-Way and Buildings" was issued to address concerns with administering expired special use authorizations.

Exhibit 40

32



SUPERIOR COURT OF CALIFORNIA

COUNTY OF SACRAMENTO

ENVIRONMENTAL LAW
FOUNDATION, et al.

      Petitioners,

v.

STATE WATER RESOURCES
CONTROL BOARD, et al.

      Respondents.

Case No.:  34-2010-80000583

ORDER AFTER HEARING ON CROSS
MOTIONS FOR JUDGMENT ON THE
PLEADINGS

 

The County of Siskiyou's motion for judgment on the pleadings is denied, and the cross-motion for judgment on the pleadings by Petitioners Environmental Law foundation, et al., is granted.

On May 16, 2014, hearing was held on the court's tentative ruling granting Petitioners' motion for judgment on the pleadings and denying the motion for judgment on the pleadings by Respondent County of Siskiyou.  Petitioners were represented by James Wheaton, Lowell Chow and Richard Frank.  County of Siskiyou was represented by Roderick E. Walston.  Respondent State Water Resources Control Board was represented by Deputy Attorneys General Mark Pool and Daniel M. Fuchs.

Based on the pleadings and arguments presented, the tentative ruling, as modified below, is adopted as the court's statement of decision.[1]

---

[1] The County requested hearing on the court's tentative ruling to raise an issue not addressed by the tentative ruling:  Does the Board have authority to regulate groundwater under the public trust doctrine?  The parties disagreed whether Petitioners pled a cause of action against the Board stating an actual case and controversy raising this issue.  The County thus requested permission to file a cross-complaint against the Board to put the issue before the court.  The court granted the County's request.

The County also asked the court to defer adopting its tentative ruling until it also rules on the Board's authority.  The court postponed ruling on this request until the County filed its cross-complaint and the Board filed a response.

The County filed its cross-complaint against the Board on June 13, 2014.  The Board informed the court it intends to demur to the cross-complaint.  Given the court's writ calendar,

Exhibit 41

33

## INTRODUCTION

Petitioners the Environmental Law Foundation, Pacific Coast Federation of Fishermen's Associations and Institute for Fisheries Resources bring this an action against Respondents County of Siskiyou ("County") and the State Water Resources Board ("Board") raising an issue of first impression: Does the public trust doctrine apply to groundwater hydrologically connected to a navigable river? Petitioners seek a declaration it does. They also seek a writ of mandate or injunction compelling the County to stop issuing well drilling permits until it complies with its duties under the public trust doctrine. No affirmative relief is sought against the Board – just declaratory relief but not specific to the Board.

In its answer to the petition, the County asserted four affirmative defenses: (1) the public trust doctrine does not apply to groundwater; (2) the Board has no authority to regulate groundwater under the public trust doctrine; (3) the County is not required to regulate groundwater under the public trust doctrine; and (4) the public trust doctrine does not apply in this case because a 1980 decree by the Siskiyou County Superior Court adjudicated all rights to the groundwater at issue.

Petitioners and the County filed cross-motions for judgment on the pleadings, seeking a ruling on the County's affirmative defenses. The cross-motions raise two legal issues: Does the public trust doctrine apply to the facts alleged? If so, does it impose any duties on the County that can be enforced by writ of mandate or injunction?

As explained below, the court concludes the public trust doctrine protects navigable waterways from harm caused by groundwater extraction, and Petitioners state facts sufficient to entitle them to judgment so declaring. The court also concludes the County, as a subdivision of the State, is required to consider the public trust when it issues well drilling permits. Again, Petitioners state facts sufficient to entitle them to a writ or injunction compelling the County to do so. The court thus grants Petitioners' motion for judgment on the pleadings and denies the County's motion.

Although Petitioners are entitled to judgment on three of the County's affirmative

---

hearing on the Board's demurrer is scheduled February 27, 2015. The court therefore finds resolution of the question of application of the public trust doctrine to groundwater affecting navigable waters should not be delayed pending hearing on the Board's demurrer.

Exhibit 41

34

defenses, they are not entitled to judgment against the County. The County denies most of the factual allegations in the petition. Petitioners must still prove those allegations to prevail on the merits. This ruling thus does not dispose of this case; it simply allows the case to proceed beyond the pleading stage.

Nor does this ruling address the Board's authority, *vel non*, to regulate groundwater under the public trust doctrine. Petitioners seek no affirmative relief against the Board or declaratory relief specific to the Board. Contrary to Petitioners' assertion, the declaratory relief sought here would not "settle" the question of the Board's authority. (Petitioner's Resp. to Court's Req. at 4:13-14.) Moreover, neither motion for judgment on the pleadings is brought by, or asserted against, the Board. The County raises the Board's lack of authority as an affirmative defense. However, the Board's authority is not relevant to whether the petition states facts sufficient to constitute a cause of action *against the County*. It is thus unnecessary to address the Board's authority in ruling on the cross-motions for judgment on the pleadings.

## BACKGROUND

When ruling on a motion for judgment on the pleadings, the court accepts as true all factual allegations in the challenged pleading. (*County of Orange v. Association of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 32.) Here the petition alleges the following facts.

The Scott River located in Siskiyou County is a navigable waterway used for boating and fishing. (Pet. ¶ 16.) In the past two decades the Scott River experienced decreased flows caused in part by groundwater pumping. (Pet. ¶ 22.) Groundwater is water beneath the surface of the ground. (See, e.g., Water Code § 1005.1; § 5000, subd. (a); § 10752, subd. (a); § 31142.24, subd. (g); § 60015; § 75502.) Petitioners use the terms "interconnected groundwater" to refer to groundwater so hydrologically connected to the Scott River that its pumping causes decreased flows in the river. (See, e.g., Pet. ¶¶ 17, 20, 22.) According to Petitioners, at times almost every gallon of groundwater pumped decreases the flow of the Scott River by the same amount. (Pet. ¶ 22.)

As a result of these decreased flows, the Scott River is often "dewatered" in the summer and early fall. The river is then reduced to a series of pools. (Pet. ¶ 24.) This, in turn, has injured the river's fish populations. (Pet. ¶ 21.) Although not explicitly alleged, it is implicit this also

3

Exhibit 41

35

impacts the Scott River's navigability, rendering it less suitable for boating and other recreational activities. (Pet. ¶¶ 24-26.)

The County is responsible for issuing permits for wells used to pump groundwater. (Pet. ¶ 3.) Petitioners allege the County does not consider the effect groundwater pumping will have on the Scott River when it issues its permits. (Pet. ¶¶ 36-39.) Petitioners believe the public trust doctrine requires the County to consider those effects when issuing permits to pump groundwater. Petitioners thus seek (1) a declaration groundwater hydrologically connected to navigable surface waters is protected by the public trust doctrine, and must be managed consistent with the public trust doctrine; and (2) a writ or injunction compelling the County to stop issuing permits until it complies with its duties under the public trust doctrine.[2] (Pet. at 12:6-9.)

This litigation follows a 1980 degree issued by the Siskiyou County Superior Court adjudicating "all surface water rights in the Scott River stream system" and "all rights to *ground water* that is interconnected with the Scott River," and reserving jurisdiction to thereafter "change or modify the [decree] as the interests of justice so require." (Pet. ¶ 18; *In the Matter of Determination of the Rights of the Various Claimants to the Waters of Scott River Stream System*, Siskiyou County Superior Court, Decree No. 30662 (Jan. 16, 1980) [emphasis added].)[3] Petitioners allege the decree does not apply to new wells constructed "at least 500 feet from the Scott River or at the most distant point from the river on the land that overlies the interconnected groundwater, whichever is less." (Pet. ¶ 18.) Petitioners refer to this as the "zone of

---

[2] Precisely what the County's duties may be is not alleged in Petitioners' prayer, and thus need not be determined in ruling on this motion. (See *Kramer v. Intuit Inc.* (2004) 121 Cal.App.4th 574, 578 [pleading motion does not determine *what* relief is available – only whether plaintiff has alleged facts sufficient to entitle it to *some* relief.) As explained below, the County has a duty to consider the public trust when issuing well drilling permits. If the County fails to consider the public trust, mandate would lie to compel it to do so. (*California Assn. of Health Services at Home v. State Dept. of Health Care Services* (2012) 204 Cal.App.4[th] 676, 683.) Although mandate will lie to compel the County to *exercise* its discretion, it will not lie to compel the County to exercise its discretion in a *particular manner*. (*Id.*; *Neighbors in Support of Appropriate Land Use v. County of Tuolumne* (2007) 157 Cal.App.4[th] 997, 1004.) It would initially be up to the County to determine its duties under the public trust doctrine.

[3] The 1980 decree, alleged in the petition, is a judicially noticeable fact that may be considered in ruling on this motion. (Code Civ. Proc. § 438, subd. (d).) Both parties asked the court to judicially notice the decree. The request is granted. The decree is attached to Petitioners' Memo of Points and Authorities and the County's November 16, 2010, Request for Judicial Notice.

Exhibit 41

36

adjudication." (Pet. ¶¶ 18, 19, 23, 24, 36-39, 42.) The relief Petitioners request applies *only* to permits for new wells outside the "zone of adjudication. This litigation thus does not address (1) wells inside the zone of adjudication, or (2) wells or groundwater rights adjudicated by the 1980 decree.[4] (Pet. ¶¶ 36-39, 12:6-9.)

## STANDARD OF REVIEW

A motion for judgment on the pleadings, like a demurrer, "attacks only defects disclosed on the face of the pleadings or by matters that can be judicially noticed." (*Cloud v. Northrop Grumman Corp.* (1998) 67 Cal.App.4th 995, 999; see also Code Civ. Proc. § 438, subd. (d).) The court accepts the truth of all factual allegations in the pleadings, giving them a liberal construction. (*County of Orange, supra*, 192 Cal.App.4th at 32; *Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal. 4th 524, 528 [demurrer].)

A respondent may bring a motion for judgment on the pleadings on the ground the petition does not state facts sufficient to constitute a cause of action against it. (Code Civ. Proc. § 438, subd. (c)(1)(B)(ii).)

Petitioners may bring a motion for judgment on the pleadings on the ground the petition does state facts sufficient to constitute a cause of action and the County's answer does not state facts sufficient to constitute a defense. (Code Civ. Proc. § 438, subd. (c)(2).)

## ANALYSIS

### 1. The public trust doctrine protects navigable waters from harm caused by the extraction of groundwater

#### A. The public trust doctrine

The public trust doctrine is a common law doctrine whose roots stretch back to Roman law. Under the doctrine the State of California, as sovereign, owns all navigable waterways within its borders, but not in the usual proprietary sense. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 482.) Instead, the State holds title as trustee of a public trust for the benefit of the People of California. (*Colberg, Inc. v. State* (1967) 67 Cal.2d 408, 416.) As the United States Supreme Court explained over a century ago, "It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty

---

[4] If this is incorrect, Petitioners should so state at the hearing.

Exhibit 41

5

37

of fishing therein freed from the obstruction or interference of private parties." (*Illinois Central Railroad Co. v. Illinois* (1882) 146 U.S. 387, 452.)

The nature of the State's title imposes fiduciary-like obligations:  The State has a duty to supervise and administer the trust so the public may continue to use navigable waterways for trust purposes.  (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 437 ["*National Audubon*"]; *Illinois Central*, *supra*, 146 U.S. at 453.)  The State cannot abdicate its duties.  (*Illinois Central*, *supra*, 146 U.S. at 453.)

However, the State's obligation to protect the public trust is not absolute.  Instead, the State's obligation is to ***consider*** the public trust when allocating water resources, and to preserve trust uses ***whenever feasible***.  (*National Audubon*, *supra*, 33 Cal.3d at 446 [emphasis added].)  These caveats are important.  The doctrine does not prohibit the State from permitting actions that harm public trust uses.  As our Supreme Court recognized, "The population and economy of this state depend upon the appropriation of vast quantities of water for uses unrelated to in-stream trust values."  (*Id*.)  The public trust doctrine thus does not strip the State of the power "to grant usufructuary licenses that will permit an appropriator to take water from flowing streams and use that water in a distant part of the state, even though this taking does not promote, and may unavoidable harm, the trust uses at the source stream."  (*Id*.)  When it grants such licenses, however, the State must consider the public trust:  "As a matter of practical necessity the state may have to approve appropriations despite foreseeable harm to public trust uses.  In so doing, however, the state must bear in mind its duty as trustee to consider the effect of the taking on the public trust . . . and to preserve, so far as consistent with the public interest, the uses protected by the trust."  (*Id*. at 446-47.)

Early cases generally recognized three public uses protected by the doctrine:  navigation, commerce and fishing.  (*Illinois Central*, *supra*, 146 U.S. at 452; *Bohn v. Albertson* (1951) 107 Cal.App.2d 738, 749.)  However, our Supreme Court recognized the doctrine is "sufficiently flexible to encompass changing public needs."  (*Marks v. Whitney* (1971) 6 Cal.3d 251, 259.)  It is now well established the public trust doctrine also protects the public's right to use navigable waters for hunting, bathing, swimming, boating and recreation.  (*Id*. at 259.)  It also protects environmental uses:  "one of the most important public uses of [navigable waters] is the preservation of those lands in their natural state, so that they may best serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds

Exhibit 41

38

and marine life, and which favorable affect the scenery and climate of the area." (*Id.* at 259-60.)

The public trust doctrine applies to all "navigable waterways," including lakes, rivers and streams. (*National Audubon, supra,* 33 Cal.3d at 435.) A waterway is navigable if it is capable of being used for recreational boating for at least part of the year. (*Id.* at 435, fn. 17 ["A waterway usable only for pleasure boating is nevertheless a navigable waterway and protected by the public trust"]; *People ex rel. Baker v. Mack* (1971) 19 Cal.App.3d 1040, 1044 ["the test of navigability is met if the stream is capable of boating for pleasure."]; *State of California v. Superior Court* (1981) 29 Cal.3d 210, 230 fn. 18 [river may be deemed navigable even though only navigable for part of the year].)

Petitioners allege the Scott River is a navigable waterway used for boating, rafting and fishing. (Pet. ¶ 16.) For this motion the court must assume this is true.[5] (*County of Orange, supra,* 192 Cal.App.4th at 32.) The issue then is not whether the public trust doctrine applies to the ***Scott River***. The issue is whether the public trust doctrine applies to ***groundwater*** so connected to a navigable river that its extraction harms trust uses of the river. Relying primarily on *National Audubon*, Petitioners argue the public trust doctrine applies. The court concludes they are correct.

**B.     Under *National Audubon* the public trust doctrine applies to the facts alleged here**

*National Audubon* concerned diversion of water from streams flowing into Mono Lake. Because Mono Lake received much of its water from these streams, the diversion was causing the level of the lake to drop, imperiling its "scenic beauty" and its "ecological values." (*National Audubon, supra,* 33 Cal.3d at 424-25.) Mono Lake itself was navigable; the streams being diverted were not. (*Id.* at 435.) The central issue in *National Audubon* was whether the public trust doctrine applied to diversions from these non-navigable streams. The Supreme Court held it did.

The Court's analysis went back to one of the earliest public trust cases in California, *People v. Gold Run D. & M. Co.* (1884) 66 Cal. 138 ["*Gold Run*"].) In *Gold Run* the State used the public trust doctrine to enjoin a mining company from dumping sand and gravel into an

---

[5]  In its answer to the petition, the County did not deny the Scott River is navigable. The County asserted only that the Scott River has never been "determined to be" navigable. (Answer ¶ 16.) The County subsequently filed a cross-complaint against the Board. In the cross complaint, it contends the Scott River is not navigable. (Cross-Compl., ¶ 62.)

Exhibit 41
39

unnavigable stream that flowed into the navigable Sacramento River, because the dumping raised the bed of the Sacramento River impairing navigation. (*National Audubon, supra,* 33 Cal.3d at 436; see also *Gold Run, supra,* 66 Cal. at 145-46.) The Court in *National Audubon* also cited another early case, *People v. Russ* (1901) 132 Cal. 102. In *Russ* the public trust doctrine allowed the State to require removal of dams erected on non-navigable tributaries to a navigable river, because the dams decreased the water flowing into the river, adversely affecting its navigability. (*National Audubon, supra,* 33 Cal.3d at 436.)

The Court in *National Audubon* found the reasoning of these early cases applied to diversion of water from a non-navigable tributary adversely affected a downstream navigable river or lake: "If the public trust doctrine applies to constrain *fills* which destroy navigation and other public trust uses in navigable waters, it should equally apply to constrain the *extraction* of water that destroys navigation and other public interests. Both actions result in the same damage to the public trust. [Citations.] [¶] We conclude that the public trust doctrine . . . protects navigable waters from harm caused by diversion of nonnavigable tributaries." (*Id.* at 436-37 [italics in original, internal quotes omitted].)

Although the facts alleged here are different, it is a difference without a legal distinction. *National Audubon* involved extraction of water from non-navigable surface streams. This case involves extraction of underground water. But the result is allegedly the same – decreasing the flow of navigable waters harming public trust uses.

The public trust doctrine would prevent pumping directly out of the Scott River harming public trust uses. So too under *National Audubon* the public trust doctrine would prevent pumping a non-navigable tributary of the Scott River harming public trust uses of the river. The court finds no reason why the analysis of *National Audubon* would not apply to the facts alleged here. The court thus finds the public trust doctrine protects navigable waters from harm caused by extraction of groundwater, where the groundwater is so connected to the navigable water that its extraction adversely affects public trust uses.

This formulation is slightly different than the declaration Petitioners seek. Petitioners request a declaration groundwater hydrologically connected to navigable surface flows is protected by the public trust doctrine. However, the court does not find ***groundwater*** itself is a resource protected by the public trust doctrine. (Compare *In re Water Use Permit Applications*

8

Exhibit 41
40

(Hawaii 2000) 9 P.3d 409, 445-47.)[6]  California case law has applied the public trust doctrine to
protect *navigable waters*; groundwater is not navigable.  (*Lyon, supra*, 29 Cal.3d at 228 ["it is
navigability which is the touchstone in determining whether or not the public trust applies"];
*Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4[th] 689, 709 [public
trust doctrine "has no direct application to groundwater resources."].)  The court thus finds only
that the public trust doctrine applies when the extraction of groundwater causes harm to
navigable waters harming the public's right to use those navigable waters for trust purposes.

As applied to the facts alleged here, the public trust doctrine protects the Scott River and
the public's right to use the Scott River for trust purposes, including fishing, rafting and boating.
It also protects the public's right to use, enjoy and preserve the Scott River in its natural state and
as a habitat for fish.  (See *Marks, supra*, 6 Cal.3d at 259-60 ["one of the most important public
uses . . . is the preservation of those lands in their natural state and as environments which
provide food and habitat for birds and marine life"].)  If the extraction of groundwater near the
Scott River adversely affects those rights, the public trust doctrine applies.[7]

The County argues the public trust doctrine does not apply to groundwater, because
groundwater is not navigable.  This is true, but not dispositive.  Again, the court does not hold
the public trust doctrine applies to groundwater itself.  Rather, the public trust doctrine applies if
extraction of groundwater adversely impacts a navigable waterway to which the public trust
doctrine does apply.

The County quotes the following language from *National Audubon*:  "the public trust
doctrine . . . protects navigable waters from harm caused by *diversion* of nonnavigable
*tributaries*."  (*National Audubon, supra*, 33 Cal.3d at 437 [emphasis added].)  It asserts the facts

---

[6]  In *In re Water Use Permit Applications*, the Hawaii Supreme Court held the public trust
doctrine did apply to *all* water in Hawaii.  (*Id.* at 490.)  This was based in part on a provision in
Hawaii's constitution declaring all natural resources, including water, are held in trust by the
State for the benefit of the people.  (*Id.* at 442.)  Thus, water itself, wherever found, was a natural
resource subject to the public trust.  (*Id.* at 445.)

Petitioners do not ask the court to go as far as the Hawaii Supreme Court.  Moreover, no
California case has held the public trust doctrine applies to water itself.  (But see Water Code §
102: "All water within the State is the property of the people of the State.")

[7]  Again, for purposes of these motions for judgment on the pleadings, the court assumes
groundwater extraction near the Scott River adversely affects public trust uses as Petitioners
allege.  However, to prevail on the merits Petitioners must prove this allegation, which the
County denies.

Exhibit 41

41

in this case do not involve diversion of tributaries, but extraction of groundwater.  This again is a distinction without a difference.

The County argues *extraction* of groundwater is not a *diversion*.  (County MPA at 4 fn. 2 [emphasis added].)  Perhaps.  But the County does not explain why the difference between extracting as opposed to diverting water changes the analysis.  The end result is the same -- less water in a navigable river harming public trust uses.  The County also ignores the fact the Court in *National Audubon* explained it was not limiting its holding to *diversion* of water, but also encompassed extraction: "the public trust doctrine . . . should equally apply to constrain the *extraction* of water that destroys navigation and other public interests."  (*National Audubon, supra*, 33 Cal.3d at 436 [emphasis in original].)

The County argues a tributary is a *surface* body of water flowing into a larger body of water.  From this the County concludes because groundwater flows underground, it cannot be considered a tributary.  Again a distinction without a difference.  *National Audubon* is not limited to tributaries, but applies more generally to "extraction *of water*" that harms a navigable waterway.  (*National Audubon, supra*, 33 Cal.3d at 436 [emphasis added].)  This is precisely what Petitioners allege here:  extraction of water from under the ground is directly harming public trust uses of the Scott River.

If pumping groundwater impairs the public's right to use a navigable waterway for trust purposes, there is no sound reason in law or policy why the public trust doctrine should not apply. [8]

---

[8]  Amicus curiae California Farm Bureau Federation argues "extending" the public trust doctrine to apply to extraction of groundwater would lead to a slippery slope of no stopping.  If the public trust doctrine allows the State to regulate groundwater extraction harming navigable waterways, the Federation worries it could be used to regulate things with more remote connection to waterways, like vehicle emissions or use of pesticides.

This argument fails for two reasons. First, the issue before this court is not whether the public trust doctrine *should* apply to groundwater as alleged in the petition.  The question is whether the doctrine *does* apply following the Supreme Court's decision in *National Audubon.*

Second, the possibility other activities affecting navigable waters may be too attenuated to fall within the public trust doctrine is a question for another day.  The court decides the case before it, not hypotheticals that may arise in the future. (See, e.g., *People v. Balint* (2006) 138 Cal.App.4th 200, 210.)

Exhibit 41

42

2.   **The Legislature has not released the County from its obligations under the public trust doctrine**

The County's remaining arguments are directed at Petitioners' request for injunctive and writ relief, and concern the County's duty, if any, under the public trust doctrine. The County argues even if the public trust doctrine applies to extraction of groundwater as alleged here, the doctrine does not impose any specific duty on the County.

Petitioners seek a writ of mandate or injunction compelling the County to stop issuing permits to drill wells for groundwater in the Scott River basin until it complies with its duties under the public trust doctrine. Again, Petitioners do not assert what the County's duty may be. The County nevertheless argues it has no duty to regulate groundwater under the public trust doctrine because the Legislature has given it complete discretion to decide whether to regulate groundwater. Accordingly, neither mandate nor injunctive relief will lie to compel the County to exercise its discretion.   The court is not persuaded.

The County relies on Water Code section 10750 et seq., where the Legislature declared "groundwater is a valuable natural resource in California" and should be managed accordingly. (§ 10750.) To help manage this resource the Legislature authorized local agencies, such as the County, to adopt groundwater management plans to manage groundwater resources within their jurisdictions. (§ 10753, subd. (a) ["Any local agency . . . *may* . . . adopt and implement a groundwater management plan"] [emphasis added]; § 10750.4 ["Nothing in this part requires a local agency . . . to adopt or implement a groundwater management plan"].) If a local agency decides to adopt a groundwater management plan, it is subject to substantive and procedural requirements. (See e.g., §§ 10753.2 and 10753.5 [public notice and hearing requirements], § 10753.7 [outlining components of plan].)

From this grant of authority to adopt a groundwater management plan, the County makes a big leap: Because the Legislature did not require the County to implement a groundwater management plan, the County cannot be required to regulate groundwater under the public trust doctrine. This argument fails for several reasons.

First, section 10750 et seq. does not subsume the public trust doctrine, rendering it inapplicable to groundwater. As our Supreme Court instructs, the public trust doctrine and California's statutory water rights system co-exist; neither occupies the field to the exclusion of the other. (*National Audubon, supra*, 33 Cal.3d 419, 445.) Moreover, in *Baldwin v. County of*

Exhibit 41

11

43

*Tehama* (1994) 31 Cal.App.4th 166, the Court held section 10750 et seq. does not occupy the field of groundwater regulation or preclude "further local action." (*Id.* at 181.) The Court in *Baldwin* acknowledged a "common thread" in state law suggesting a legislative determination that "problems of groundwater management should be addressed on the local level." (*Id.* at 182.) The Court found, however, "no implication of a policy in these statutes that legislative action to foster local response is comprehensive, i.e., that the mechanism for local response to the problem is to be limited to [any particular] statutory schemes." (*Id.*) The court thus finds no evidence the Legislature, in enacting section 10750 et seq., intended to ***preclude*** the County from applying the public trust doctrine where necessary.

Second, there is no conflict between authorizing the County to adopt a groundwater management plan, and requiring it to comply with the public trust doctrine. The public trust doctrine applies when the extraction of groundwater harms navigable waters and the public's use for trust purposes. If the County's issuance of well permits will result in extraction of groundwater adversely affecting the public's right to use the Scott River for trust purposes, the County must take the public trust into consideration and protect public trust uses when feasible. Such a requirement does not conflict with the County's discretion to decide whether or not to implement an overall groundwater management plan.

Third, while the County has discretion whether to adopt a groundwater management plan, it does not have discretion to ignore its duties under the public trust doctrine. Although administration of the public trust rests primarily with the State as sovereign, the County is a subdivision of the State. (Cal. Const. art XI, § 1, subd. (a) ["The State is divided into counties which are legal subdivisions of the State."]; *Baldwin, supra*, 31 Cal.App.4th at 175-76 [references to "the State" includes counties].) As a subdivision of the State, the County "shares responsibility" for administering the public trust. (See *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1370, fn. 19 ["the county, as a subdivision of the state, shares responsibility for protecting our natural resources and may not approve of destructive activities without giving due regard to the preservation of those resources."].) The State cannot abdicate its duties under the public trust doctrine. (*Illinois Central, supra*, 146 U.S. at 452 ["The State can no more abdicate its trust over property in which the whole people are interested . . . than it can abdicate its police powers"]; *National Audubon, supra*, 33 Cal.3d at 438 [trust property "is a subject of public concern to the whole people of the State" and thus "cannot

Exhibit 41

44

be alienated"].)  Neither can the County.

As the Court explained in *National Audubon*, the Legislature may grant licenses to appropriate water.  (*National Audubon, supra,* 33 Cal.3d at 446.)  When it does so, the Legislature, or its authorized agent, has "an affirmative duty to take the public trust into account . . . and to protect public trust uses whenever feasible." (*Id.*)  Thus as a legal subdivision of the State, the County has an affirmative duty to consider the public trust when it issues permits to appropriate groundwater.

The County also argues requiring it to consider the public trust when issuing well permits would subject its actions to judicial review, requiring courts to "fashion and apply" their own "common law public trust principles." (County MPA at 19:2-3.)  This would effectively transfer responsibility for managing California's groundwater from the legislative branch to the judicial branch.  Not only is the judicial branch "ill-equipped" to assume this "policy-making" role, but doing so would infringe on the Legislature's policy-making role and thus violate the separation of powers doctrine.  (*Id.* at 19:15-16.)

This argument is based almost entirely on a single sentence in a footnote in *City of Long Beach v. Mansell* (1970) 3 Cal.3d 464:  *"The administration of the trust by the state is committed to the Legislature, and a determination of that branch of government made within the scope of its powers is conclusive* in the absence of clear evidence that its effect will be to impair the power of succeeding legislatures to administer the trust in a manner consistent with its broad purposes." (*Id.* at 482 fn. 17 [emphasis added].)  From this one sentence the County concludes only the Legislature can administer the public trust, and a "system of regulation based on judicially-fashioned public trust principles" would usurp the Legislature's "conclusive" judgment in administering the trust.

The court is not persuaded.

The central issue in *Mansell* was whether the Legislature's action in releasing tidelands from the public trust violated a state constitutional provision prohibiting the grant to private persons of tidelands within two miles of any city.  (*Id.* at 478.)  In deciding this issue, the Supreme Court examined the relationship between the constitutional prohibition and the public trust doctrine.  It noted although public trust tidelands are generally not alienable, the State may determine such lands are no longer useful for trust purposes and free them from the trust.  (*Id.* at 482.)  It is in this context the Court in *Mansell* added the footnote stating the Legislature's

Exhibit 41

45

determination on such matters is conclusive.

The Court in *Mansell* cited its earlier decision in *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199 to support this statement. Similar to *Mansell*, *Mallon* involved a statute freeing from the public trust income derived from trust tidelands. As in *Mansell*, this legislative determination was deemed conclusive: "the Legislature has found and determined that . . . the income derived from the production of oil and gas from the tide and submerged lands of Long Beach harbor is no longer required for navigation, commerce and fisheries, nor for such uses, trusts, conditions and restrictions as are imposed by statutes granting the said tide and submerged lands in trust. *That* determination and finding is conclusive upon this court." (*Mallon, supra*, at 206-07 [emphasis added, internal quotes and cites omitted].)

*Mansell* and *Mallon* thus stand for a limited proposition: If the Legislature determines public trust lands or waterways are no longer useful for trust purposes and frees them from the trust, that determination is conclusive. It will not be second guessed by the courts. Neither case is applicable here. The Legislature has not released the Scott River from the public trust. Therefore, requiring the County to consider the public trust in approving well permits does not infringe upon any "conclusive" legislative determination.

Finally, the County's suggestion the separation of powers doctrine prohibits courts from applying common law public trust principles is belied by over a century of judicial decisions doing just that. Federal courts have been applying common law public trust principles since at least 1892. (*Illinois Central, supra*, 146 U.S. at 453.) California's courts have been applying public trust principles even longer, since the *Gold Run* decision of 1884. (*National Audubon, supra*, 33 Cal.3d at 436 [calling *Gold Run* "one of the epochal decisions of California history."])

### 3.     The requested relief does not intrude on the 1980 decree

The County's last argument is *sui generis*: The public trust doctrine cannot be applied to groundwater interconnected with the Scott River because the Legislature enacted a statutory system for adjudicating rights to water in "stream systems." (Water Code § 2500 et seq.) This statutory scheme specifically applies to the Scott River. (§ 2500.5.) Pursuant to this statutory scheme, in 1980 the Siskiyou County Superior Court issued a decree adjudicating all water rights in the Scott River, including ground water interconnected to the Scott River.[9] The County argues

---

[9]  As noted above, the court has judicially noticed the decree at the request of both parties.

Exhibit 41
46

any further regulation of groundwater by this court would impermissibly intrude on the jurisdiction of the Siskiyou County Superior Court.

An interesting argument, but not on point. Petitioners are clear: Their petition applies only to new wells that lie beyond the area adjudicated by the 1980 decree. (See, e.g., Pet. ¶ 18, 12:8.) By definition, the relief requested in the petition does not affect rights adjudicated by the 1980 decree.

## CONCLUSION

For the foregoing reasons, the County's motion for judgment on the pleadings is denied, and Petitioners' cross-motion for judgment on the pleadings is granted.

Dated: _July 14_, 2014

Allen Sumner
Judge of the Superior Court of California,
County of Sacramento

Exhibit 41

47

15

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

**ENVIRONMENTAL LAW FOUNDATION**     **Case Number:  34-2010-80000583**

**vs.**

                                     **CERTIFICATE OF SERVICE**
**STATE WATER RESOURCES CONTROL**   **BY MAILING (C.C.P. Sec. 1013a(4))**
**BOARD**

I, the Clerk of the Superior Court of California, County of Sacramento, certify that I am not a party to this cause, and on the date shown below I served the foregoing **ORDER AFTER HEARING** by depositing true copies thereof, enclosed in separate, sealed envelopes with the postage fully prepaid, in the United States Mail at 720 9th Street, Sacramento, California, each of which envelopes was addressed respectively to the persons and addresses shown below:

Environmental Law Foundation
1736 Franklin Street, 9th Floor
Oakland, CA 94612
Attn: James Wheaton / Lowell Chow

Pacific Coast Federation of Fishermen's Associations
Institute for Fisheries Resources
P.O. Box 11170
Eugene, OR 97440-3370
Attn: Glen Spain

University of CA, Davis
School of Law
400 Mrak Hall Dr
Davis, CA 95616
Attn: Richard Frank

Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Attn: Damien Schiff

Attorney General's Office
1300 I Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550
Attn: Allison Goldsmith

Best Best & Krieger, LLP
2001 N. Main Street, Suite 390
Walnut Creek, CA 94596
Attn: Roderick Walston

County of Siskiyou; County Counsel
205 Lane Street
P.O. Box 659
Yreka, CA 96097
Attn: Brian Morris / Natalie Reed

Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Attn: Michael Wall

I, the undersigned Deputy Clerk, declare under penalty of perjury that the foregoing is true and correct.

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SACRAMENTO

Dated:  July 15, 2014          By:    M. GARCIA,
                                      Deputy Clerk

Exhibit 41

55pos.doc

1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

2              IN AND FOR THE COUNTY OF SAN BERNARDINO.

3   DEL ROSA MUTUAL WATER COMPANY,
    a corporation,
4                              Plaintiff,            No.31798.

5              vs.

6   D. J. CARPENTER, ISABEL C. TURNER,              S T I P U L A T I O N
    J. B. JEFFERS, GEORGE S. MASON,
7   NATIONAL THRIFT CORPORATION OF
    AMERICA, a corporation, JOHN DOE                     F O R
8   McKASON, MARY GLEASON, C. M. CHRIST,
    GREAT VIEW WATER COMPANY, NETTIE               J U D G M E N T
9   D. PHILLIPS, PACIFIC-SOUTHWEST TRUST
    & SAVINGS BANK, a corporation,
10  ARTHUR R. PECK, CARRIE A. PECK,
    ELLEN A. McLAUGHLIN, ARROWHEAD
11  SPRINGS CORPORATION, a corporation,
    ARROWHEAD SPRINGS COMPANY, a
12  corporation, J. N. BAYLIS, CALIFORNIA
    CONSOLIDATED WATER COMPANY, a
13  corporation, CALIFORNIA CONSUMERS
    CORPORATION, a corporation, et al.,
14
                               Defendants.
15

16          IT IS HEREBY STIPULATED by and between Del Rosa Mutual

17  Water Company, plaintiff above named, and defendants, California Con-

18  solidated Water Company, a corporation, Arrowhead Springs Corporation,

19  Ltd. (sued herein as "Arrowhead Springs Corporation"), a corporation,

20  Arrowhead Springs Company, a corporation, California Consumers Com-

21  pany, (sued herein as "California Consumers Corporation"), a corpora-

22  tion, D. J. Carpenter, Isabel C. Turner, J. B. Jeffers, George S.

23  Mason, J. B. McKason, (and herein as "John Doe McKason"), and

24  National Thrift Corporation of America, a corporation, and between

25  defendants themselves, as follows:

26          That the judgment in said action attached to this stipula-

27  tion and made a part hereof may be decreed and entered in said action

28  as the judgment determining and adjudicating the rights of the vari-

29  ous parties to this action to take, divert, and use water from the

30  sources and supply referred to in the complaint, and such rights shall

31  be as in said judgment specified and adjudicated, and not otherwise,

32  and as full and complete settlement of all the issues raised in the

                              -1-
                                                    Exhibit 42
                                                        49

1   pleadings in said cause and of the entire controversy between the

2   parties to this litigation, and that said judgment, immediately up-

3   on the entry thereof, shall be final and not subject to appeal or

4   review in any manner by any of the parties, to said cause.

5       IT IS FURTHER STIPULATED, by and between defendant

6   Arrowhead Springs Corporation, Ltd. and defendant California Con-

7   solidated Water Company, that nothing in this stipulation, nor in

8   said judgment, shall in anywise affect, amend or otherwise impair

9   any contracts now in existence, or which may be executed as of the

10  date of said judgment, by and between said defendants, Arrowhead

11  Springs Corporation, Ltd. and California Consolidated Water Com-

12  pany, relating to the water of East Twin Creek or any of its

13  tributaries.

14      IT IS FURTHER STIPULATED  that findings of fact and con-

15  clusions of law, except as set out and contained in the judgment,

16  are waived.

17                  SWING & WILSON

18                  By _____
                        Attorneys for Plaintiff

19

20

21                  O'CONNOR & FINDLAY

22                  By _____
                        Attorneys for defendants and cross-
23                      complainants, D. J. Carpenter, Isabel
                        C. Turner, J. B. Jeffers, George S.
24                      Mason, L. R. McKeeson and National
                        Thrift Company of America.

25

26                  GIBSON, DUNN & CRUTCHER,

27                  By _____
                        Attorneys for Arrowhead Springs Cor-
28                      poration, Ltd. and Arrowhead Springs
                        Company.

29

30                  LAWLER & DEGNAN,

                    By _____
31                      Attorneys for California Consolidated
                        Water Company and California Consumers
32                      Company.

Exhibit 42

-2-

JCL/IR  8   9/24/31.

C.

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

IN AND FOR THE COUNTY OF SAN BERNARDINO.

- - - - - - -

DEL ROSA MUTUAL WATER COMPANY,
a corporation,

                    Plaintiff,

vs.

D. J. CARPENTER, ISABEL C. TURNER,
J. B. JEFFERS, GEORGE S. MASON,
NATIONAL THRIFT CORPORATION OF
AMERICA, a corporation, JOHN DOE
McKASON, MARY GLEASON, C. M. CHRIST,
GREAT VIEW WATER COMPANY, NETTIE
D. PHILLIPS, PACIFIC-SOUTHWEST TRUST
& SAVINGS BANK, a corporation,
ARTHUR R. PECK, CARRIE A. PECK,
ELLEN A. McLAUGHLIN, ARROWHEAD
SPRINGS CORPORATION, a corporation,
ARROWHEAD SPRINGS COMPANY, a cor-
poration, J. N. BAYLIS, CALIFORNIA
CONSOLIDATED WATER COMPANY, a
corporation, CALIFORNIA CONSUMERS
CORPORATION, a corporation, et al.,

                    Defendants.

- - - - - - -

No. 31798

J U D G M E N T

The above entitled action coming on regularly to be
heard before the Court without a jury, a trial by jury having been
waived by the respective parties, Messrs. Swing & Wilson and Ralph
E. Swing appearing as attorneys for the plaintiff, Messrs. Lawler &
Degnan appearing for and as attorneys for defendants, California
Consolidated Water Company and California Consumers Company (sued
herein as "California Consumers Corporation"), respectively, and
Messrs. Gibson, Dunn & Crutcher appearing for and as attorneys for
defendants Arrowhead Springs Company and Arrowhead Springs Corpora-
tion, Ltd. (sued herein as "Arrowhead Springs Corporation"), and
Messrs. O'Connor & Findlay appearing for and as attorneys for the
other defendants above mentioned, and this cause being at issue and
~~except the defendant J. K. M. Kassen~~ the parties having entered into a stipulation in writing for the
entry of this judgment, and findings of fact and conclusions of law,
except as set out and contained in this judgment, having been duly

-1-

Exhibit 42
51

and oral evidence having been introduced

waived by the respective parties, and the Court being fully advised in the premises, and good and sufficient cause appearing therefor; and the evidence

NOW, THEREFORE, in accordance with said stipulation,

IT IS HEREBY ADJUDGED:

1. That plaintiff is, and defendants California Consolidated Water Company, Arrowhead Springs Corporation, Ltd. (sued herein as "Arrowhead Springs Corporation"), Arrowhead Springs Company and California Consumers Company (sued herein as "California Consumers Corporation") are corporations duly organized and existing and duly qualified and authorized to do and transact business within the State of California.

2. That neither the California Consumers Company nor the Arrowhead Springs Company have at this time any right, title or interest in or to any of the water or in or to the right to take, divert, use or transport any of the water referred to in the complaint in said action or in this judgment.

3. That East Twin Creek is a natural stream of water situated in the County of San Bernardino, State of California, and has its source in the San Bernardino Mountains lying and being to the north of the City of San Bernardino. That all of the waters of what is known as East Twin Creek watershed, except as diminished by use by defendant Arrowhead Springs Corporation, Ltd., and its predecessors in interest and by use by defendant California Consolidated Water Company and its predecessors in interest, and except as the waters thereof are lost by evaporation, transpiration, seepage and other natural causes, drain into and become a part of said East Twin Creek above the point of plaintiff's diversion hereinafter referred to. That the principal tributaries of said East Twin Creek are Strawberry Creek, Coldwater Creek, Hot Springs Creek, and other named and unnamed tributaries and springs, all of which flow and percolate into and, except as diminished as aforesaid, become a part of said East Twin Creek; also waters seep and percolate into said

-2-

Exhibit 42

52

East Twin Creek and its tributaries from the adjacent hills and lands draining into said East Twin Creek and its various tributaries and the canyons draining into said stream. That Strawberry Creek and its tributaries are the easterly branch of East Twin Creek above the junction of Strawberry Creek and Coldwater Creek; Coldwater Creek and its tributaries are the westerly branch of East Twin Creek above the junction of Strawberry Creek and Coldwater Creek;  Hot Springs Creek and its tributaries are the lowest branch of East Twin Creek.  That at the time of the appropriation, as hereinafter set forth, of the waters of said East Twin Creek by plaintiff's predecessors in interest all of the waters of said East Twin Creek and of its tributaries, except that part thereof then being used by defendant Arrowhead Springs Corporation, Ltd. and its predecessors on lands in Section 7, Township 1 North, Range 3 West, S.B.B.& M., and on lands in Sections 11 and 12, Township 1 North, Range 4 West, S.B.B.& M., above the point of plaintiff's intake, and that part lost by evaporation, transpiration, seepage and other natural causes, flowed in a southerly direction in a natural stream to and into the San Bernardino Valley, and at the time of the appropriation of the right to use such water by plaintiff's predecessors in interest none of said water had been appropriated, diverted, or used except by said Arrowhead Springs Corporation, Ltd. and its said predecessors for use upon said lands above plaintiff's point of appropriation.

That subsequent to the time when defendant, Arrowhead Springs Corporation, Ltd., or its predecessors in interest, acquired title to all the lands described in paragraph 4 below, except the north half of the northwest quarter (N½ of NW¼) of Section 12, Township 1 North, Range 4 West, S.B.B.& M., plaintiff or its predecessors in interest entered into and upon said East Twin Creek at about one mile north of the mouth of said East Twin Creek and appropriated and diverted all of the water of said stream flowing at said point and thereafter, except as hereunder provided, diverted all of the

-3-

Exhibit 42
53

water of said stream flowing at said point into a ditch and conduit and conveyed the same away to nonriparian lands for beneficial uses thereon.

That the point on said stream where said appropriation and diversion was so made by plaintiff, or its predecessors in interest, was below the confluence of all of said branches of said East Twin Creek and below where all of the waters of said East Twin Creek watershed converge, except as diminished as aforesaid.  That ever since said appropriation and diversion of said stream all of the waters of said stream flowing at said point have been and now are taken and used for irrigation and other beneficial uses and purposes by plaintiff and its predecessors in interest, and by defendants and cross complainants named in paragraph 6 hereof, except as diminished from time to time by the use by defendant Arrowhead Springs Corporation, Ltd. and its predecessors in interest and by natural causes as aforesaid, and except that said California Consolidated Water Company and its predecessors in interest have for more than five years prior to the commencement of this action diverted into reservoirs and tanks and have diverted, taken and transported to Los Angeles and other places for bottling purposes and other commercial uses, water from said watershed adversely to said plaintiff, and to all other defendants, except Arrowhead Springs Corporation, Ltd.

4.    That in the year 1863 David Noble Smith, predecessor in interest of defendant Arrowhead Springs Corporation, Ltd., settled on the East half of the Southeast quarter and the Southeast quarter of the Northeast quarter of Section Eleven (11) and the Northwest quarter of the Southwest quarter of Section Twelve (12), Township 1 North, Range 4 West, S.B.B. & M., which lands were then and until 1878 unsurveyed, and thereafter, on the 1st day of February, 1882, patent was issued therefor; that on the 3rd day of April, 1871, pursuant to the Acts of Congress approved July 27, 1866, and March 3, 1871, there was granted to Southern Pacific Railroad Company

-4-

Exhibit 42

54

1  of California, predecessor in interest of defendant Arrowhead Springs
2  Corporation, Ltd., all of Section Seven (7), Township 1 North, Range
3  3 West, S.B.B.& M., and thereafter, on the 1st day of November, 1897,
4  patent was issued therefor (which patent contained no reservation of
5  water rights whatsoever); that on the 3rd day of April, 1871, pur-
6  suant to the Acts of Congress approved July 27, 1866, and March 3,
7  1871, there was granted to Southern Pacific Railroad Company of
8  California, predecessor in interest of defendant Arrowhead Springs
9  Corporation, Ltd., the west half of the southeast quarter ($W\frac{1}{2}$ of $SE\frac{1}{4}$)
10 and the southwest quarter of the northeast quarter ($SW\frac{1}{4}$ of $NE\frac{1}{4}$) of
11 Section 11, Township 1 North, Range 4 West, S.B.B.& M., and there-
12 after, on the 9th day of January, 1885, patent was issued therefor
13 (which patent contained no reservation of water rights whatsoever);
14 that on the 3rd day of May, 1877, A.B.Chapman and others, predeces-
15 sors in interest of the defendant Arrowhead Springs Corporation, Ltd.,
16 made application to the United States Land Office to purchase the
17 following described land as timberland:

> The northeast quarter of the southwest quarter ($NE\frac{1}{4}$ of $SW\frac{1}{4}$),
> the north half of the southeast quarter ($N\frac{1}{2}$ of $SE\frac{1}{4}$) and
> the southeast quarter of the northeast quarter ($SE\frac{1}{4}$ of $NE\frac{1}{4}$)
> of Section 12, Township 1 North, Range 4 West, S.B.B.& M.;

21 that thereafter, on the 15th day of August, 1889, patent was issued
22 therefor; that in the year 1880 Thomas B. Elder, predecessor in in-
23 terest of defendant Arrowhead Springs Corporation, Ltd., entered in-
24 to possession of the south half of the northwest quarter ($S\frac{1}{2}$ of $NW\frac{1}{4}$)
25 and the west half of the northeast quarter ($W\frac{1}{2}$ of $NE\frac{1}{4}$) of Section 12,
26 Township 1 North, Range 4 West, S.B.B.& M., and that thereafter, on
27 the 6th day of October, 1888, patent was issued therefor; that on the
28 29th day of October, 1891, Herbert J. Royer, predecessor in interest
29 of the defendant, Arrowhead Springs Corporation, Ltd., entered upon
30 the north half of the northwest quarter ($N\frac{1}{2}$ of $NW\frac{1}{4}$) of Section 12,
31 Township 1 North, Range 4 West, S.B.B. & M., and that thereafter, on
32 the 12th day of November, 1897, patent was issued therefor; that all

Exhibit 42

-5-

55

of the lands described in this paragraph are contiguous and, except
such portions thereof as lie outside of the watershed of East Twin
Creek, are bordering on and have access to, and are riparian to,
said East Twin Creek, and all of said lands are now the property of
defendant, Arrowhead Springs Corporation, Ltd., and all that portion
of said lands which lie within the watershed of said East Twin Creek
are hereinafter referred to as the Arrowhead Springs property.  That
the whole of said land is located above plaintiff's point of ap-
propriation and intake.

That said defendant, Arrowhead Springs Corporation, Ltd.,
is now and it and its predecessors in interest have, for more than
fifty (50) years last past, been conducting and operating on said
Arrowhead Springs property a health and pleasure resort, consisting
of a hotel building, cottages, bungalows and all usual and customary
outbuildings, swimming pools, baths and other accessories, which es-
tablishment is now, and for many years last past has been, known as
"Arrowhead Springs Hotel", and, adversely to the said plaintiff and
said defendants and cross-complainants, has taken and diverted water
from said East Twin Creek and its tributaries above plaintiff's point
of diversion for use in said hotel, cottages, bungalows and out-
buildings for domestic purposes and for baths, swimming pools and other
purposes in connection therewith and for irrigation of said Arrow-
head Springs property, and has also, for more than five (5) years
prior to the commencement of this action, taken and diverted water
from said East Twin Creek and its tributaries, above plaintiff's
point of appropriation and diversion, for use in its steam cave baths
situated in Waterman Canyon adversely to the said plaintiff and de-
fendants and cross-complainants named in paragraph 6 hereof, and has
also, for more than five (5) years prior to the commencement of this
action, used adversely to the said plaintiff and said defendants and
cross-complainants, the waters of Penyugal Spring, Granite Spring and
other hot springs, all of which are located in Hot Springs Canyon on

-6-

Exhibit 42

56

said Arrowhead Springs property and are tributary to Hot Springs Creek, which Creek is the lowest branch of East Twin Creek, for the purpose of bottling the same and shipping the same outside of the watershed of East Twin Creek and selling the same in bottles and other containers for human consumption as mineral water, and has the right, except as limited by the provisions of paragraph (i) hereof, as such riparian owner and as appropriator and by prescription to continue so to take and use water from said East Twin Creek and its tributaries and to take and use said water on said Arrowhead Springs property for all beneficial and riparian uses and to whatever extent may be required for such uses and to take and use water from said source for use in its steam cave baths in Waterman Canyon and to take and use water from said Penyugal Spring, Granite Spring and other hot springs and to bottle and ship the same outside of the watershed in East Twin Creek, and to sell the same in bottles and other containers for human consumption as mineral water.

5. That the defendant, California Consolidated Water Company, now is and it and its predecessors in interest have been engaged in the business of diverting water from East Twin Creek and/or its tributaries into reservoirs and tanks and from thence transporting the same by means of cars and other conveyances to the City of Los Angeles, where said water is bottled for domestic use and used for the manufacture of beverages and other purposes; that said defendant, California Consolidated Water Company, has entered in and upon the springs at the headwaters of said Strawberry Creek and developed the water at said Springs that would not naturally flow to plaintiff's said point of diversion, and diverted the water of said springs including the water so developed into a pipe line and by means thereof conveyed a part thereof to its said tanks and reservoirs and transported said part thereof from such tanks and reservoirs to Los Angeles where such water has been and is now being used by said defendant in its said business. That said defendant has ex-

-7-

Exhibit 42
57

1  pended large sums of money in so developing said springs and convey-
2  ing said water, and has developed an extensive business dependent
3  entirely upon such supply of water, and it would be inequitable to
4  enjoin said defendant from continuing to so take and use said water;
5  that said defendant requires the use of all the water now flowing
6  and hereafter developed and flowing from said springs tributary to
7  said Strawberry Creek lying north of the north line of the south half
8  of Section 31 and north of the north line of the south half of Sec-
9  tion 32, both in Township 2 North, Range 3 West, S.B.B.& M., and, ex-
10 cept as limited by the provisions of paragraph (i) hereof, is entitled
11 to take and use said water; that the taking of such water will be
12 injurious to plaintiff's right, but such injury can be compensated
13 in damages and such damage is hereby determined to be and is the sum
14 of twenty thousand dollars ($20,000.00). That such diversion by
15 defendant, California Consolidated Water Company, will not, subject
16 to the terms of paragraph (i) hereof, impair any right of any other
17 party hereto.

18     6.    That defendants and cross-complainants, D. J.
   E. C. Jaffards (sued herein as John Hoe)
19 Carpenter, Isabel C. Turner, J. B. Jeffers, George S. Mason, L. R.
20 McKesson and National Thrift Company of America, were at the time of
21 the commencement of this action and they and their successors in
22 interest now are the owners of the right to take and use the first
23 ten (10) inches of the flow of the water of East Twin Creek reach-
24 ing plaintiff's point of diversion; that said ten inch right is part
25 of the right appropriated by plaintiff's predecessors in interest;
26 that all of said ten inches, or fraction thereof, when reaching
27 plaintiff's point of diversion, has been diverted by plaintiff and
28 its predecessors in interest into its pipe line and delivered to said
29 defendants at a diversion box at a point about one mile easterly from
30 plaintiff's said point of diversion, and said defendants and cross-
31 complainants are hereby determined to be the owners of said first
32 ten (10) inches of the flow of said creek reaching plaintiff's point

Exhibit 42

of diversion and entitled to have said ten (10) inches of water reaching plaintiff's point of diversion delivered to them by plaintiff at the said diversion box, and said plaintiff shall continue to take and divert and deliver the same.

7.    That the taking of such water as set forth in paragraph 5 above may be injurious to the rights of defendants and cross-complainants, D. J. Carpenter, Isabel C. Turner, J. B. E. C. Jeffers (and herein as John A os) Jeffers, George S. Mason, L. A. McKesson and National Thrift Company of America, unless said water from said Hot Springs Creek and said East Twin Creek be diverted at a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek and from thence conveyed into plaintiff's present pipe line, the northerly terminus of which is plaintiff's diversion box located about one mile northerly from the mouth of said East Twin Creek Canyon, and that said defendants and cross-complainants are entitled to have said ten (10) inches thereof belonging to them so diverted and conveyed and delivered to them by plaintiff at the present diversion box located about one mile easterly from plaintiff's said present point of diversion.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED:

(a)    That defendant, Arrowhead Springs Corporation, Ltd., is, subject to the provisions of subdivision (i) hereof, the owner of the right to take water from said East Twin Creek and its tributaries and to use said water upon its said Arrowhead Springs property riparian to East Twin Creek, to the extent that such water is or may be required for any beneficial or riparian use upon said property, and to use said water to the extent of five (5) miner's inches, measured under a four inch pressure, in its steam cave baths and for domestic purposes in Waterman Canyon during the period from the first day of November to the first day of May of

Exhibit 42

-9-

59

each year at all times during said period when the taking thereof will not reduce the water flowing at plaintiff's intake below ten (10) inches, and to use said water to the extent of one (1) miner's inch, measured under a four inch pressure, in its steam cave baths and for domestic purposes in Waterman Canyon at all other times, and is also, subject to the provisions of sub-division (i) hereof, the owner of the right to bottle and ship, out of the said East Twin Creek watershed, waters of Penyugal Spring, Granite Spring and other hot springs tributary to Hot Springs Creek, provided, however, that said defendant, Arrowhead Springs Corporation, Ltd., shall not so use the waters of Hot Springs Creek, for shipment, irrigation or otherwise, as to re-duce the flow of the waters of Hot Springs Creek at the point of its confluence with East Twin Creek below ten (10) miner's inches, measured under a four inch pressure, provided further, however, that no part or portion of any of the water of East Twin Creek, or any of its tributaries, except as otherwise herein provided, shall ever be taken to or used upon lands not riparian to said East Twin Creek.

(b)   That defendant, California Consolidated Water Com-pany,is, subject to the provisions of subdivision (i) hereof, the owner of the right to take, impound, divert, transport and carry away water of that certain spring known as "Indian Spring" and any and all of the water of all springs situated or obtainable in that part of East Twin Creek known as "Strawberry Creek and Canyon" and canyons lateral thereto lying north of a line drawn east and west through Sections 31 and 32, Township 2 North, Range 3 West, S.B.B. & M., coincident with the northerly line of the south half of Sec-tion 31 and the south half of Section 32, Township 2 North, Range 3 West, S.B.B. & M., and it may enter in and upon that portion of

-10-

Exhibit 42

60

1   said Strawberry Creek and Canyon and lateral canyons thereto lying
2   north of said line and develop, by means of tunnels or otherwise,
3   any and all springs or water situated or obtainable from said area
4   north of said line, and may take and divert all of said water
5   flowing and to flow in and from said springs and/or obtainable in
6   said area into a pipe line and divert and carry the same, by and
7   through such pipe line, to tanks and reservoirs upon said Arrowhead
8   Springs property, and may take and transport the same beyond and
9   out of said watershed for bottling or other purposes or uses.

10          (c)   Defendant, Arrowhead Springs Corporation, Ltd.,
11   shall at all times maintain suitable and proper septic and treating
12   tanks upon its lands and shall cause all sewage to pass through
13   such septic and treating tanks and be properly treated before re-
14   turning the same to or permitting the same to return to or flow in-
15   to said East Twin Creek, and said tanks shall be so constructed and
16   located that all water flowing from said septic tanks, not used on
17   the premises, shall return and flow into said East Twin Creek
18   above plaintiff's point of diversion.

19          Defendant, Arrowhead Springs Corporation, Ltd., shall al-
20   so cause all water that may be diverted for use by said Arrowhead
21   Springs Corporation, Ltd., not actually consumed in the exercise of
22   the rights hereinbefore decreed to Arrowhead Springs Corporation,
23   Ltd., to return and flow into said East Twin Creek above plaintiff's
24   point of diversion.

25          (d)   That plaintiff have and recover of and from the
26   defendant, California Consolidated Water Company, the sum of fifteen
27   thousand dollars ($15,000.00), and from defendant, Arrowhead Springs
28   Corporation, Ltd., the sum of five thousand dollars ($5,000.00).

29          (e)   That plaintiff is the owner of the right to have all
30   the water of East Twin Creek and its tributaries which flows to its
31   said intake, subject only to the rights of defendants Arrowhead
32   Springs Corporation, Ltd., California Consolidated Water Company,

-11-

Exhibit 42
61

and defendants and cross-complainants designated in paragraph **6**, as herein set forth.

(f) Plaintiff shall have the right to enter in and upon the lands of the defendant, Arrowhead Springs Corporation, Ltd. and construct a diversion weir and box and submerged dam upon said East Twin Creek at a point three hundred (300) feet northerly of the confluence of Hot Springs Creek and East Twin Creek, and also at the confluence of said streams, and may construct a pipe line or conduit from such point to plaintiff's present diversion box and may take and divert all of the water ordinarily flowing in said East Twin Creek at such diversion point subject only to the rights of defendants Arrowhead Springs Corporation, Ltd. and California Consolidated Water Company, and defendants and cross-complainants designated in paragraph 6, as herein set forth. The right of ingress and egress for construction and maintenance of said diversion weir and box, dam and pipe line or conduit shall be exercised in such a manner as to do the least possible damage to land, improvements, plantings and natural trees and shrubbery upon said Arrowhead Springs property, and said pipe line, if constructed, shall be maintained as free from leaks as possible and shall at all times have a depth of cover of at least two feet over the top of the pipe.

(g) Cross-complainants, D. J. Carpenter, Isabel C. Turner, J. W. Jeffers, George S. Mason, L. R. McKesson and National Thrift Company of America, and their successors in interest, are the owners of the right to take and use the first ten (10) inches of water, or fraction thereof, reaching the point of diversion referred to in paragraph 6 hereof, and diverted by plaintiff into its pipe line from East Twin Creek and may take and divert said first ten (10) inches of water, or fraction thereof, reaching said point of diversion, from plaintiff's said pipe line at the diversion box now in place and used for such purpose.

E.C. Jeffers (sued herein as John A re)

-12-

Exhibit 42

62

That plaintiff shall immediately hereafter, at its own expense and cost, undertake and thereafter diligently prosecute the construction of such pipe line and such diversion dams, weirs, and boxes as may be necessary to divert and convey the water to which plaintiff and/or cross-complainants are entitled hereunder, from Hot Springs Creek and East Twin Creek from a point at or adjacent to the point of confluence of said Hot Springs Creek and East Twin Creek to and into plaintiff's present diversion box and pipe line, and said plaintiff shall complete said construction work on or before the 1st day of May, 1932, and shall thereafter maintain the same at its own expense, and shall thereafter convey through said pipe line and structure at least ten (10) miner's inches of said water of Hot Springs Creek and East Twin Creek if that amount be flowing therein from said point at or adjacent to the confluence of Hot Springs Creek and East Twin Creek to and into its present diversion box and pipe line, and convey such ten (10) inches thereof from thence to the point of the present diversion box of plaintiff from which diversion box defendant and cross-complainants are now taking their said ten (10) inches of said water, it being the intent and purpose hereof that said plaintiff shall deliver the first ten (10) inches of the flow of East Twin Creek at plaintiff's present point of diversion or the first ten (10) inches of water flowing in Hot Springs Creek and East Twin Creek at their point of confluence to defendants and cross-complainants at the present diversion box located at a point on plaintiff's pipe line about one mile easterly from plaintiff's present point of diversion.

(h)   Each of the parties hereto is perpetually enjoined from taking, using or interfering with the use of the waters of East Twin Creek and its tributaries except as herein decreed.

(i)   This judgment shall not in anywise affect, amend, or otherwise impair any contracts now in existence, or which may be

-13-

Exhibit 42

63

executed as of the date of this judgment, by and between defendant
Arrowhead Springs Corporation, Ltd. and defendant California
Consolidated Water Company, relating to the water of East Twin
Creek or any of its tributaries.

(j)  That pursuant to said stipulation, this judgment
shall be final upon the entry thereof, and not subject to appeal
or review in any manner by any of the parties to said stipulation.

(k)  Each of the parties hereto shall pay its own costs.

Done in open court this 19ᵗʰ day of October,
1931.

_____
                        Judge

-14-

Exhibit 42

64

1      IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

2          IN AND FOR THE COUNTY OF SAN BERNARDINO.

3      _____

4      DEL ROSA MUTUAL WATER COMPANY,    )
       a corporation,                    )
5                                        )
                      Plaintiff,         )    NO. 31798
6                                        )
                      vs.                )
7                                        )    SATISFACTION
       D. J. CARPENTER, et al,           )    OF JUDGMENT.
8                                        )
                      Defendants.        )
9      _____  )

10

11          The Judgment herein in favor of plaintiff, Del

12     Rosa Mutual Water Company, a corporation, and against defendant

13     California Consolidated Water Company, a corporation, in the sum

14     of Fifteen Thousand Dollars ($15,000.), having been paid, full

15     satisfaction is hereby acknowledged of said Judgment entered

16     in Book __60__, page __200__,of Judgments; and the Clerk

17     is hereby authorized and directed to enter full satisfaction

18     of record in said action.

19          Dated: ~~September 26~~, October 19th, 1931

20

21

22     STATE OF CALIFORNIA   )
                             )ss.
23     COUNTY OF SAN BERNARDINO )

24          On this ___ day of September, 1931, before me,

25     _____, a Notary Public in and for said

26     County and State, residing therein, duly commissioned and sworn,

27     personally appeared _____

28     known to me to be the person whose name is subscribed to the

29     within instrument, and ___he___ duly acknowledged to me that

30     ___he___ executed the same.

31          IN WITNESS WHEREOF, I have hereunto set my hand and
       affixed my Official Seal the day and year in this certificate
32     first above written.

                              Notary Public in and for the County
                              of San Bernardino, State of
                              California.

Exhibit 42     65

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,

2         IN AND FOR THE COUNTY OF SAN BERNARDINO.

3

4    DEL ROSA MUTUAL WATER COMPANY,
     a corporation,

5
                        Plaintiff,           NO. 31798

6
          vs.
7                                            SATISFACTION
     D. J. C'RIENTER, et al,                 OF JUDGMENT.

8
                        Defendants.

9

10

11            The Judgment herein in favor of plaintiff, Del Rosa

12    Mutual Water Company, a corporation, and against defendant

13    Arrowhead Springs Corporation, Ltd., a corporation, in the sum

14    of Five Thousand Dollars ($5,000.), having been paid, full

15    satisfaction is hereby acknowledged of said Judgment entered

16    in Book __60__, page __200__, of Judgments; and the Clerk is

17    hereby authorized and directed to enter full satisfaction of

18    record in said action.

                   October 19th
19         Dated: September 26, 1931.

20

21

22

23                             attorneys for Plaintiff

24

25

26

27

28

29

30

31

32

Exhibit 42

66

1  STATE OF CALIFORNIA      )
2  COUNTY OF SAN BERNARDINO )ss.

3          On this ____ day of September, 1931, before me,

4  _____, a Notary Public in and for said

5  County and State, residing therein, duly commissioned and sworn,

6  personally appeared _____.

7  known to me to be the person whose name is subscribed to the

8  within instrument, and ____ duly acknowledged to me that

9  ____ executed the same.

10         IN WITNESS WHEREOF, I have hereunto set my hand and

11 affixed my Official Seal to day and year in this certificate

12 first above written.

13

14                         Notary Public in and for the
15                         County of San Bernardino, State
                           of California.
16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32                                              Exhibit 42

LAWLER & DEGNAN
ATTORNEYS AT LAW
900 STANDARD OIL BUILDING
Tel. TRINITY 5111