Authorization ID: FCD728501                                   FS-2700-4 (VER. 03/17)
Contact ID: NESTLE WATERS NORTH AMERICA, INC.                 OMB 0596-0082
Expiration Date: 12/31/2023
Use Code: 931, 753, 715, 915

**U.S. DEPARTMENT OF AGRICULTURE**
**FOREST SERVICE**

**SPECIAL USE PERMIT**

**AUTHORITY:**
**ORGANIC ADMINISTRATION ACT June 4, 1897, FEDERAL LAND POLICY AND MGMT ACT, AS
AMENDED October 21, 1976**

NESTLE WATERS NORTH AMERICA, INC. of 5772 JURUPA STREET ATTN: NATURAL RESOURCES
MANAGER, ONTARIO CA UNITED STATES 91761 (hereinafter "the holder") is authorized to use or
occupy National Forest System lands in the SAN BERNARDINO NATIONAL FOREST, subject to the
terms and conditions of this special use permit (the permit).

This permit covers 4.51 acres in Sec. 30, T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 31, T 2
N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 6, T. 1 N., R. 3 W., SAN BERNARDINO MERIDIAN,
SE ¼ SE ¼ of Sec. 1, T. 1 N., R. 4 W., SAN BERNARDINO MERIDIAN, NE ¼ Sec. 12, T. 1 N., R. 4 W.,
SAN BERNARDINO MERIDIAN, "the permit area"), as shown on the map attached as Appendix A.  This
and any other appendices to this permit are hereby incorporated into this permit.

This permit issued for the purpose of:

Operating and maintaining a water collection and transmission system that consists of tunnels #2 and 3,
horizontal wells 1,1A, 7, 7A, 7B, 7C, 8, 10, 11, 12 and their associated vaults, connected through 4.5
miles of 4" pipeline. This permit also authorizes the operation and maintenance of four helicopter landing
areas, 5 monitoring stations with telemetry for data transmission, and 5.7 miles of access trail (4.5 miles
of trail is along the pipeline). This permit also authorizes administrative access along Forest Service road
1N24 and maintenance of said road commensurate with use.

Occupancy and use is subject to the additional resource mitigation measures, monitoring requirements,
and adaptive management terms and conditions attached hereto and made part hereof as Appendix B.

## TERMS AND CONDITIONS

## I. GENERAL TERMS

**A. AUTHORITY.**  This permit is issued pursuant to ORGANIC ADMINISTRATION ACT June 4, 1897,
FEDERAL LAND POLICY AND MGMT ACT, AS AMENDED October 21, 1976 and 36 CFR Part 251,
Subpart B, as amended, and is subject to their provisions.

**B. AUTHORIZED OFFICER.**  The authorized officer is the Forest or Grassland Supervisor or a
subordinate officer with delegated authority.

**C. TERM.** This permit shall expire at midnight on 8/24 2021, 3 years from the date of issuance.

1

Initials _____

**D. <u>CONTINUATION OF USE AND OCCUPANCY.</u>** This permit is not renewable.  Prior to expiration of this permit, the holder may apply for a new permit for the use and occupancy authorized by this permit.  Applications for a new permit must be submitted at least 6 months prior to expiration of this permit.  Issuance of a new permit is at the sole discretion of the authorized officer.  At a minimum, before issuing a new permit, the authorized officer shall ensure that (1) the use and occupancy to be authorized by the new permit is consistent with the standards and guidelines in the applicable land management plan; (2) the type of use and occupancy to be authorized by the new permit is the same as the type of use and occupancy authorized by this permit; and (3) the holder is in compliance with all the terms of this permit.  The authorized officer may prescribe new terms and conditions when a new permit is issued.

**E. <u>AMENDMENT.</u>** This permit may be amended in whole or in part by the Forest Service when, at the discretion of the authorized officer, such action is deemed necessary or desirable to incorporate new terms that may be required by law, regulation, directive, the applicable forest land and resource management plan, or projects and activities implementing a land management plan pursuant to 36 CFR Part 215.

**F. <u>COMPLIANCE WITH LAWS, REGULATIONS, AND OTHER LEGAL REQUIREMENTS.</u>** In exercising the rights and privileges granted by this permit, the holder shall comply with all present and future federal laws and regulations and all present and future state, county, and municipal laws, regulations, and other legal requirements that apply to the permit area, to the extent they do not conflict with federal law, regulation, or policy.  The Forest Service assumes no responsibility for enforcing laws, regulations, and other legal requirements that fall under the jurisdiction of other governmental entities.

**G. <u>NON-EXCLUSIVE USE.</u>** The use or occupancy authorized by this permit is not exclusive.  The Forest Service reserves the right of access to the permit area, including a continuing right of physical entry to the permit area for inspection, monitoring, or any other purpose consistent with any right or obligation of the United States under any law or regulation.  The Forest Service reserves the right to allow others to use the permit area in any way that is not inconsistent with the holder's rights and privileges under this permit, after consultation with all parties involved.  Except for any restrictions that the holder and the authorized officer agree are necessary to protect the installation and operation of authorized temporary improvements, the lands and waters covered by this permit shall remain open to the public for all lawful purposes.

**H. <u>ASSIGNABILITY.</u>** This permit is not assignable or transferable.

**I. <u>TRANSFER OF TITLE TO THE IMPROVEMENTS.</u>**

1. <u>Notification of Transfer.</u>  The holder shall notify the authorized officer when a transfer of title to all or part of the authorized improvements is planned.

2. <u>Transfer of Title.</u>  Any transfer of title to the improvements covered by this permit shall result in termination of the permit.  The party who acquires title to the improvements must submit an application for a permit.  The Forest Service is not obligated to issue a new permit to the party who acquires title to the improvements.  The authorized officer shall determine that the applicant meets requirements under applicable federal regulations.

**J. <u>CHANGE IN CONTROL OF THE BUSINESS ENTITY.</u>**

1. <u>Notification of Change in Control.</u> The holder shall notify the authorized officer when a change in control of the business entity that holds this permit is contemplated.

2

Initials

(a) In the case of a corporation, control is an interest, beneficial or otherwise, of sufficient outstanding voting securities or capital of the business so as to permit the exercise of managerial authority over the actions and operations of the corporation or election of a majority of the board of directors of the corporation.

(b) In the case of a partnership, limited partnership, joint venture, or individual entrepreneurship, control is a beneficial ownership of or interest in the entity or its capital so as to permit the exercise of managerial authority over the actions and operations of the entity.

(c) In other circumstances, control is any arrangement under which a third party has the ability to exercise management authority over the actions or operations of the business.

2. Effect of Change in Control. Any change in control of the business entity as defined in paragraph 1 of this clause shall result in termination of this permit. The party acquiring control must submit an application for a special use permit. The Forest Service is not obligated to issue a new permit to the party who acquires control. The authorized officer shall determine whether the applicant meets the requirements established by applicable federal regulations.

## II. IMPROVEMENTS

**A. LIMITATIONS ON USE.** Nothing in this permit gives or implies permission to build or maintain any structure or facility or to conduct any activity, unless specifically authorized by this permit. Any use not specifically authorized by this permit must be proposed in accordance with 36 CFR 251.54. Approval of such a proposal through issuance of a new permit or permit amendment is at the sole discretion of the authorized officer.

**B. PLANS.** All plans for development, layout, construction, reconstruction, or alteration of improvements in the permit area, as well as revisions to those plans must be prepared by a professional engineer, architect, landscape architect, or other qualified professional based on federal employment standards acceptable to the authorized officer. These plans and plan revisions must have written approval from the authorized officer before they are implemented. The authorized officer may require the holder to furnish as-built plans, maps, or surveys upon completion of the work.

**C. CONSTRUCTION.** Any construction authorized by this permit shall commence by N/A and shall be completed by N/A.

## III. OPERATIONS.

**A. PERIOD OF USE.** Use or occupancy of the permit area shall be exercised at least 365 days each year.

**B. CONDITION OF OPERATIONS.** The holder shall maintain the authorized improvements and permit area to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the authorized officer and consistent with other provisions of this permit. Standards are subject to periodic change by the authorized officer when deemed necessary to meet statutory, regulatory, or policy requirements or to protect national forest resources. The holder shall comply with inspection requirements deemed appropriate by the authorized officer.

**C. OPERATING PLAN.** The holder shall prepare and annually revise by May 1st an operating plan. The operating plan shall be prepared in consultation with the authorized officer or the authorized officer's designated representative and shall cover all operations authorized by this permit. The operating plan shall outline steps the holder will take to protect public health and safety and the environment and shall

3                                                    Initials

include sufficient detail and standards to enable the Forest Service to monitor the holder's operations for compliance with the terms and conditions of this permit. The operating plan shall be submitted by the holder and approved by the authorized officer or the authorized officer's designated representative prior to commencement of operations and shall be attached to this permit as an appendix. The authorized officer may require an annual meeting with the holder to discuss the terms and conditions of the permit or operating plan, annual use reports, or other concerns either party may have.

**D. MONITORING BY THE FOREST SERVICE.** The Forest Service shall monitor the holder's operations and reserves the right to inspect the permit area and transmission facilities at any time for compliance with the terms of this permit. The holder shall comply with inspection requirements deemed appropriate by the authorized officer. The holder's obligations under this permit are not contingent upon any duty of the Forest Service to inspect the permit area or transmission facilities. A failure by the Forest Service or other governmental officials to inspect is not a justification for noncompliance with any of the terms and conditions of this permit.

## IV. RIGHTS AND LIABILITIES

**A. LEGAL EFFECT OF THE PERMIT.** This permit, which is revocable and terminable, is not a contract or a lease, but rather a federal license. The benefits and requirements conferred by this authorization are reviewable solely under the procedures set forth in 36 CFR Part 251, Subpart C, and 5 U.S.C. 704. This permit does not constitute a contract for purposes of the Contract Disputes Act, 41 U.S.C. 601. The permit is not real property, does not convey any interest in real property, and may not be used as collateral for a loan.

**B. VALID EXISTING RIGHTS.** This permit is subject to all valid existing rights. Valid existing rights include those derived under mining and mineral leasing laws of the United States. The United States is not liable to the holder for the exercise of any such right.

**C. ABSENCE OF THIRD-PARTY BENEFICIARY RIGHTS.** The parties to this permit do not intend to confer any rights on any third party as a beneficiary under this permit.

**D. SERVICES NOT PROVIDED.** This permit does not provide for the furnishing of road or trail maintenance, water, fire protection, search and rescue, or any other such service by a government agency, utility, association, or individual.

**E. RISK OF LOSS.** The holder assumes all risk of loss associated with use or occupancy of the permit area, including but not limited to theft, vandalism, fire and any fire-fighting activities (including prescribed burns), avalanches, rising waters, winds, falling limbs or trees, and other forces of nature. If authorized temporary improvements in the permit area are destroyed or substantially damaged, the authorized officer shall conduct an analysis to determine whether the improvements can be safely occupied in the future and whether rebuilding should be allowed. If rebuilding is not allowed, the permit shall terminate.

**F. DAMAGE TO UNITED STATES PROPERTY.** The holder has an affirmative duty to protect from damage the land, property, and other interests of the United States. Damage includes but is not limited to fire suppression costs and damage to government-owned improvements covered by this permit.

1. The holder shall be liable for all injury, loss, or damage, including fire suppression, prevention and control of the spread of invasive species, or other costs in connection with rehabilitation or restoration of natural resources resulting from the use or occupancy authorized by this permit. Compensation shall include but not be limited to the value of resources damaged or destroyed, the costs of restoration, cleanup, or other mitigation, fire suppression or other types of abatement costs, and all administrative

4                                                    Initials

legal (including attorney's fees), and other costs.  Such costs may be deducted from a performance bond required under clause IV.J.

2.  The holder shall be liable for damage caused by use of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees to all roads and trails of the United States to the same extent as provided under clause IV.F.1, except that liability shall not include reasonable and ordinary wear and tear.

**G. HEALTH AND SAFETY.**  The holder shall take all measures necessary to protect the health and safety of all persons affected by the use and occupancy authorized by this permit.  The holder shall promptly abate as completely as possible and in compliance with all applicable laws and regulations any physical or mechanical procedure, activity, event, or condition existing or occurring in connection with the authorized use and occupancy during the term of this permit that causes or threatens to cause a hazard to the health or safety of the public or the holder's employees or agents.  The holder shall as soon as practicable notify the authorized officer of all serious accidents that occur in connection with these procedures, activities, events, or conditions.  The Forest Service has no duty under the terms of this permit to inspect the permit area or operations of the holder for hazardous conditions or compliance with health and safety standards.

**H. ENVIRONMENTAL PROTECTION**

1.  For purposes of clause IV.H  and section V, "hazardous material" shall mean (a) any hazardous substance under section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. 9601(14); (b) any pollutant or contaminant under section 101(33) of CERCLA, 42 U.S.C. 9601(33); (c) any petroleum product or its derivative, including fuel oil, and waste oils; and (d) any hazardous substance, extremely hazardous substance, toxic substance, hazardous waste, ignitable, reactive or corrosive materials, pollutant, contaminant, element, compound, mixture, solution or substance that may pose a present or potential hazard to human health or the environment under any applicable environmental laws.

2.  The holder shall avoid damaging or contaminating the environment, including but not limited to the soil, vegetation (such as trees, shrubs, and grass), surface water, and groundwater, during the holder's use and occupancy of the permit area.  Environmental damage includes but is not limited to all costs and damages associated with or resulting from the release or threatened release of a hazardous material occurring during or as a result of activities of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees on, or related to, the lands, property, and other interests covered by this permit.  If the environment or any government property covered by this permit becomes damaged in connection with the holder's use and occupancy, the holder shall as soon as practicable repair the damage or replace the damaged items to the satisfaction of the authorized officer and at no expense to the United States.

3.  The holder shall as soon as practicable, as completely as possible, and in compliance with all applicable laws and regulations abate any physical or mechanical procedure, activity, event, or condition existing or occurring in connection with the authorized use and occupancy during or after the term of this permit that causes or threatens to cause harm to the environment, including areas of vegetation or timber, fish or other wildlife populations, their habitats, or any other natural resources.

**I. INDEMNIFICATION OF THE UNITED STATES.**  The holder shall indemnify, defend, and hold harmless the United States for any costs, damages, claims, liabilities, and judgments arising from past, present, and future acts or omissions of the holder in connection with the use or occupancy authorized by this permit.  This indemnification provision includes but is not limited to acts and omissions of the holder or the holder's heirs, assigns, agents, employees, contractors, or lessees in connection with the use or occupancy authorized by this permit which result in (1) violations of any laws and regulations which are

5

Initials

now or which may in the future become applicable; (2) judgments, claims, demands, penalties, or fees assessed against the United States; (3) costs, expenses, and damages incurred by the United States; or (4) the release or threatened release of any solid waste, hazardous waste, hazardous materials, pollutant, contaminant, oil in any form, or petroleum product into the environment. The authorized officer may prescribe terms that allow the holder to replace, repair, restore, or otherwise undertake necessary curative actions to mitigate damages in addition to or as an alternative to monetary indemnification.

## V. <u>RESOURCE PROTECTION</u>

**A. <u>COMPLIANCE WITH ENVIRONMENTAL LAWS.</u>**  The holder shall in connection with the use or occupancy authorized by this permit comply with all applicable federal, state, and local environmental laws and regulations, including but not limited to those established pursuant to the Resource Conservation and Recovery Act, as amended, 42 U.S.C. 6901 et seq., the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq., the Oil Pollution Act, as amended, 33 U.S.C. 2701 et seq., the Clean Air Act, as amended, 42 U.S.C. 7401 et seq., CERCLA, as amended, 42 U.S.C. 9601 et seq., the Toxic Substances Control Act, as amended, 15 U.S.C. 2601 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. 136 et seq., and the Safe Drinking Water Act, as amended, 42 U.S.C. 300f et seq.

**B. <u>VANDALISM.</u>**  The holder shall take reasonable measures to prevent and discourage vandalism and disorderly conduct and when necessary shall contact the appropriate law enforcement officer.

## C. <u>PESTICIDE USE</u>

1.  Authorized Officer Concurrence.  Pesticides may not be used outside of buildings in the permit area to control pests, including undesirable woody and herbaceous vegetation (including aquatic plants), insects, birds, rodents, or fish without prior written concurrence of the authorized officer.  Only those products registered or otherwise authorized by the U.S. Environmental Protection Agency and appropriate State authority for the specific purpose planned shall be authorized for use within areas on National Forest System lands.

2.  Pesticide-Use Proposal.  Requests for concurrence of any planned uses of pesticides shall be provided in advance using the Pesticide-Use Proposal (form FS-2100-2).  Annually the holder shall, on the due date established by the authorized officer, submit requests for any new, or continued, pesticide usage.  The Pesticide-Use Proposal shall cover a 12-month period of planned use.  The Pesticide-Use Proposal shall be submitted at least 60 days in advance of pesticide application.  Information essential for review shall be provided in the form specified.  Exceptions to this schedule may be allowed, subject to emergency request and approval, only when unexpected outbreaks of pests require control measures which were not anticipated at the time a Pesticide-Use Proposal was submitted.

3.  Labeling, Laws, and Regulations.  Label instructions and all applicable laws and regulations shall be strictly followed in the application of pesticides and disposal of excess materials and containers.  No pesticide waste, excess materials, or containers shall be disposed of in any area administered by the Forest Service.

**D. <u>ARCHAEOLOGICAL AND PALEONTOLOGICAL DISCOVERIES.</u>**  The holder shall immediately notify the authorized officer of all antiquities or other objects of historic or scientific interest, including but not limited to historic or prehistoric ruins, fossils, or artifacts discovered in connection with the use and occupancy authorized by this permit.  The holder shall follow the applicable inadvertent discovery protocols for the undertaking provided in an agreement executed pursuant to section 106 of the National Historic Preservation Act, 54 U.S.C. 306108; if there are no such agreed-upon protocols, the holder shall leave these discoveries intact and in place until consultation has occurred, as informed, if applicable, by

6                                                                          Initials _____

any programmatic agreement with tribes.  Protective and mitigation measures developed under this clause shall be the responsibility of the holder.  However, the holder shall give the authorized officer written notice before implementing these measures and shall coordinate with the authorized officer for proximate and contextual discoveries extending beyond the permit area.

**E. NATIVE AMERICAN GRAVES PROTECTION AND REPATRIATION ACT (NAGPRA).**  In accordance with 25 U.S.C. 3002(d) and 43 CFR 10.4, if the holder inadvertently discovers human remains, funerary objects, sacred objects, or objects of cultural patrimony on National Forest System lands, the holder shall immediately cease work in the area of the discovery and shall make a reasonable effort to protect and secure the items.  The holder shall follow the applicable NAGPRA protocols for the undertaking provided in the NAGPRA plan of action or the NAGPRA comprehensive agreement; if there are no such agreed-upon protocols, the holder shall as soon as practicable notify the authorized officer of the discovery and shall follow up with written confirmation of the discovery.  The activity that resulted in the inadvertent discovery may not resume until 30 days after the forest archaeologist certifies receipt of the written confirmation, if resumption of the activity is otherwise lawful, or at any time if a binding written agreement has been executed between the Forest Service and the affiliated Indian tribes that adopts a recovery plan for the human remains and objects.

**F. PROTECTION OF THREATENED AND ENDANGERED SPECIES, SENSITIVE SPECIES, AND SPECIES OF CONSERVATION CONCERN AND THEIR HABITAT**

1.  Threatened and Endangered Species and Their Habitat.  The location of sites within the permit area needing special measures for protection of plants or animals listed as threatened or endangered under the Endangered Species Act (ESA) of 1973, 16 U.S.C. 1531 et seq., as amended, or within designated critical habitat shall be shown on a map in an appendix to this permit and may be shown on the ground.  The holder shall take any protective and mitigation measures specified by the authorized officer as necessary and appropriate to avoid or reduce effects on listed species or designated critical habitat affected by the authorized use and occupancy.  Discovery by the holder or the Forest Service of other sites within the permit area containing threatened or endangered species or designated critical habitat not shown on the map in the appendix shall be promptly reported to the other party and shall be added to the map.

2.  Sensitive Species and Species of Conservation Concern and Their Habitat.  The location of sites within the permit area needing special measures for protection of plants or animals designated by the Regional Forester as sensitive species or as species of conservation concern pursuant to FSM 2670 shall be shown on a map in an appendix to this permit and may be shown on the ground.  The holder shall take any protective and mitigation measures specified by the authorized officer as necessary and appropriate to avoid or reduce effects on sensitive species or species of conservation concern or their habitat affected by the authorized use and occupancy.  Discovery by the holder or the Forest Service of other sites within the permit area containing sensitive species or species of conservation concern or their habitat not shown on the map in the appendix shall be promptly reported to the other party and shall be added to the map.

**G. SURVEY AND MANAGE SPECIES AND THEIR HABITAT.**  The location of sites within the permit area occupied by survey and manage species or their habitat shall be shown on a map in an appendix to this permit and may be shown on the ground.  The survey and manage species and survey and manage standards and guidelines were established in the 1994 Northwest Forest Plan amendments to all Forest Service land and resource management plans in western Oregon and Washington and northern California, as amended by the January 2001 Record of Decision (2001 ROD). The list of survey and manage species in the 2001 ROD has been amended and is subject to periodic amendment by the Forest Service.  Per the 2001 ROD, before conducting habitat-disturbing activities in the permit area, the holder shall perform a survey and shall implement appropriate survey and manage standards and guidelines identified by the authorized officer to provide for a reasonable assurance of species

7                                                        Initials _____

persistence.  Discovery by the holder or the Forest Service of other sites within the permit area containing survey and manage species or their habitat not shown on the map in the appendix shall be promptly reported to the other party and shall be added to the map.

H. **CONSENT TO STORE HAZARDOUS MATERIALS.**  The holder shall not store any hazardous materials at the site without prior written approval from the authorized officer.  This approval shall not be unreasonably withheld.  If the authorized officer provides approval, this permit shall include, or in the case of approval provided after this permit is issued, shall be amended to include specific terms addressing the storage of hazardous materials, including the specific type of materials to be stored, the volume, the type of storage, and a spill plan.  Such terms shall be proposed by the holder and are subject to approval by the authorized officer.

1.  If the holder receives consent to store hazardous material, the holder shall identify to the Forest Service any hazardous material to be stored at the site.  This identifying information shall be consistent with column (1) of the table of hazardous materials and special provisions enumerated at 49 CFR 172.101 whenever the hazardous material appears in that table.  For hazard communication purposes, the holder shall maintain Material Safety Data Sheets for any stored hazardous chemicals, consistent with 29 CFR 1910.1200(c) and (g).  In addition, all hazardous materials stored by the holder shall be used, labeled, stored, transported, and disposed of in accordance with all applicable federal, state, and local laws and regulations.

2.  The holder shall not release any hazardous material as defined in clause [IV.H for non-federal entities/IV.G for federal entities] onto land or into rivers, streams, impoundments, or natural or man-made channels leading to them.  All prudent and safe attempts must be made to contain any release of these materials. The authorized officer in charge may specify specific conditions that must be met, including conditions more stringent than federal, state, and local regulations, to prevent releases and protect natural resources.

3.  If the holder uses or stores hazardous materials at the site, upon revocation or termination of this permit the holder shall provide the Forest Service with a report certified by a professional or professionals acceptable to the Forest Service that the permit area is uncontaminated by the presence of hazardous materials and that there has not been a release or discharge of hazardous materials upon the permit area, into surface water at or near the permit area, or into groundwater below the permit area during the term of the permit.  If a release or discharge has occurred, the professional or professionals shall document and certify that the release or discharge has been fully remediated and that the permit area is in compliance with all applicable federal, state, and local laws and regulations.

## I. CLEANUP AND REMEDIATION

1.  The holder shall immediately notify all appropriate response authorities, including the National Response Center and the authorized officer or the authorized officer's designated representative, of any oil discharge or of the release of a hazardous material in the permit area in an amount greater than or equal to its reportable quantity, in accordance with 33 CFR Part 153, Subpart B, and 40 CFR Part 302. For the purposes of this requirement, "oil" is as defined by section 311(a)(1) of the Clean Water Act, 33 U.S.C. 1321(a)(1). The holder shall immediately notify the authorized officer or the authorized officer's designated representative of any release or threatened release of any hazardous material in or near the permit area which may be harmful to public health or welfare or which may adversely affect natural resources on federal lands.

2.  Except with respect to any federally permitted release as that term is defined under Section 101(10) of CERCLA, 42 U.S.C. 9601(10), the holder shall clean up or otherwise remediate any release, threat of release, or discharge of hazardous materials that occurs either in the permit area or in connection with

8

Initials _____

the holder's activities in the permit area, regardless of whether those activities are authorized under this permit. The holder shall perform cleanup or remediation immediately upon discovery of the release, threat of release, or discharge of hazardous materials. The holder shall perform the cleanup or remediation to the satisfaction of the authorized officer and at no expense to the United States. Upon revocation or termination of this permit, the holder shall deliver the site to the Forest Service free and clear of contamination.

## VI. **LAND USE FEE AND DEBT COLLECTION**

**A. LAND USE FEES.**  The holder shall pay an initial annual land use fee of $2059.04 for the period from 01/01/2018 to 12/31/2018, and thereafter on January 1, 2019 shall pay an annual land use fee of $2102.25. The annual land use fee shall be adjusted annually using the implicit price deflator-gross national product (IPD-GNP) index as shown in the Linear Right Of Way (LROW) fee schedule.

**B. MODIFICATION OF THE LAND USE FEE.**  The land use fee may be revised whenever necessary to reflect the market value of the authorized use or occupancy or when the fee system used to calculate the land use fee is modified or replaced.

## C. FEE PAYMENT ISSUES.

1. Crediting of Payments.  Payments shall be credited on the date received by the deposit facility, except that if a payment is received on a non-workday, the payment shall not be credited until the next workday.

2. Disputed Fees.  Fees are due and payable by the due date. Disputed fees must be paid in full. Adjustments will be made if dictated by an administrative appeal decision, a court decision, or settlement terms.

3. Late Payments

(a) Interest.  Pursuant to 31 U.S.C. 3717 et seq., interest shall be charged on any fee amount not paid within 30 days from the date it became due. The rate of interest assessed shall be the higher of the Prompt Payment Act rate or the rate of the current value of funds to the United States Treasury (i.e., the Treasury tax and loan account rate), as prescribed and published annually or quarterly by the Secretary of the Treasury in the Federal Register and the Treasury Fiscal Requirements Manual Bulletins. Interest on the principal shall accrue from the date the fee amount is due.

(b) Administrative Costs.  If the account becomes delinquent, administrative costs to cover processing and handling the delinquency shall be assessed.

(c) Penalties.  A penalty of 6% per annum shall be assessed on the total amount that is more than 90 days delinquent and shall accrue from the same date on which interest charges begin to accrue.

(d) Termination for Nonpayment.  This permit shall terminate without the necessity of prior notice and opportunity to comply when any permit fee payment is 90 calendar days from the due date in arrears. The holder shall remain responsible for the delinquent fees.

4. Administrative Offset and Credit Reporting.  Delinquent fees and other charges associated with the permit shall be subject to all rights and remedies afforded the United States pursuant to 31 U.S.C. 3711 et seq. and common law. Delinquencies are subject to any or all of the following:

(a) Administrative offset of payments due the holder from the Forest Service.

9

Initials

(b) If in excess of 60 days, referral to the United States Department of the Treasury for appropriate collection action as provided by 31 U.S.C. 3711(g)(1).

(c) Offset by the Secretary of the Treasury of any amount due the holder, as provided by 31 U.S.C. 3720 et seq.

(d) Disclosure to consumer or commercial credit reporting agencies.

## VII. REVOCATION, SUSPENSION, AND TERMINATION

**A. REVOCATION AND SUSPENSION.** The authorized officer may revoke or suspend this permit in whole or in part:

1. For noncompliance with federal, state, or local law.

2. For noncompliance with the terms of this permit.

3. For abandonment or other failure of the holder to exercise the privileges granted.

4. With the consent of the holder.

5. For specific and compelling reasons in the public interest.

Prior to revocation or suspension, other than immediate suspension under clause VI.B, the authorized officer shall give the holder written notice of the grounds for revocation or suspension and a reasonable period, typically not to exceed 90 days, to cure any noncompliance.

**B. IMMEDIATE SUSPENSION.** The authorized officer may immediately suspend this permit in whole or in part when necessary to protect public health or safety or the environment. The suspension decision shall be in writing. The holder may request an on-site review with the authorized officer's supervisor of the adverse conditions prompting the suspension. The authorized officer's supervisor shall grant this request within 48 hours. Following the on-site review, the authorized officer's supervisor shall promptly affirm, modify, or cancel the suspension.

**C. APPEALS AND REMEDIES.** Written decisions by the authorized officer relating to administration of this permit are subject to administrative appeal pursuant to 36 CFR Part 214, as amended. Revocation or suspension of this permit shall not give rise to any claim for damages by the holder against the Forest Service.

**D. TERMINATION.** This permit shall terminate when by its terms a fixed or agreed upon condition, event, or time occurs without any action by the authorized officer. Examples include but are not limited to expiration of the permit by its terms on a specified date and termination upon change of control of the business entity. Termination of this permit shall not require notice, a decision document, or any environmental analysis or other documentation. Termination of this permit is not subject to administrative appeal and shall not give rise to any claim for damages by the holder against the Forest Service.

## E. RIGHTS AND RESPONSIBILITIES UPON REVOCATION OR TERMINATION WITHOUT ISSUANCE OF A NEW PERMIT.
Upon revocation or termination of this permit without issuance of a new permit, the holder shall remove all structures and improvements, except those owned by the United States, within a reasonable period prescribed by the authorized officer and shall restore the site to the satisfaction of the authorized officer. If the holder fails to remove all structures and improvements within the prescribed period, they shall become the property of the United States and may be sold, destroyed, or otherwise

10                                                      Initials _____

disposed of without any liability to the United States. However, the holder shall remain liable for all costs associated with their removal, including costs of sale and impoundment, cleanup, and restoration of the site.

## VIII. MISCELLANEOUS PROVISIONS

**A. MEMBERS OF CONGRESS.** No member of or delegate to Congress or resident commissioner shall benefit from this permit either directly or indirectly, except to the extent the authorized use provides a general benefit to a corporation.

**B. CURRENT ADDRESSES.** The holder and the Forest Service shall keep each other informed of current mailing addresses, including those necessary for billing and payment of land use fees.

**C. SUPERSEDED PERMIT.** This permit supersedes a special use permit designated ARROWHEAD MT. SPRING WATER CO., CAJ728501, dated 08/02/1978.

**D. SUPERIOR CLAUSES.** If there is a conflict between any of the preceding printed clauses and any of the following clauses, the preceding printed clauses shall control.

**E. NOXIOUS WEEDS (R5-D9).** The permit holder shall prepare, in cooperation with the Forest Service, a noxious weed plan for surveying, preventing, reporting, controlling and monitoring noxious weed populations on the authorized areas and within the holder's area of responsibility. These measures may include, where appropriate, equipment inspection for soil, seeds, and vegetative matter, equipment cleaning, and use of weed-free materials (soil, gravel, straw, mulch) and seed mixes. A current list of noxious weeds of concern is available at the Forest Supervisor's Office.

## F. GROUND SURFACE PROTECTION AND RESTORATION (D-9).

The holder shall prevent and control soil erosion and gullying on National Forest System lands in and adjacent to the permit area resulting from construction, operation, maintenance, and termination of the authorized use. The holder shall construct authorized improvements so as to avoid accumulation of excessive amounts of water in the permit area and encroachment on streams. The holder shall revegetate or otherwise stabilize (for example, by constructing a retaining wall) all ground where the soil has been exposed as a result of the holder's construction, maintenance, operation, or termination of the authorized use.

## G. WATER WELLS AND ASSOCIATED PIPELINES (D-23).

1. State and Local Documentation for Water Wells. The holder shall obtain all required State and local water permits, licenses, registrations, certificates, and rights for existing and proposed water wells and shall provide a copy of this documentation to the Authorized Officer. For proposed water well construction, development or redevelopment, this documentation shall be provided prior to commencement of work.

2. Water Well Construction and Development. For water well construction and development (or redevelopment), the holder shall prepare a well construction and development plan and submit it to the Authorized Officer for approval. The well construction and development plan must have written approval from the Authorized Officer before well construction or development commences. The holder shall follow applicable Federal, State, and local standards for design, construction, and development of new wells or redevelopment of existing wells. If these standards do not exist, the holder shall follow applicable standards issued by the American Society for Testing and Materials (ASTM), American Water Works Association (AWWA), or National Ground Water Association (NGWA). The construction and development plan must identify all potential sources for any proposed water injection during well

11

Initials

construction and development.  Only non-chlorinated, potable water may be injected during construction and development of wells that will be used for monitoring or water withdrawal.  Copies of all documentation for drilling, constructing, or developing wells, including all drilling, boring, and well construction or development logs, shall be provided to the Authorized Officer within 60 days of completion of work.

3.  Water Conservation Plan.  For new or redeveloped wells, as part of a well development plan, the holder shall prepare and submit for written approval by the Authorized Officer a water conservation plan utilizing appropriate strategies to limit the amount of water removed from National Forest System lands.

4.  Water Well Decommissioning.  The holder shall properly decommission and abandon all water wells that are no longer needed or maintained in accordance with applicable Federal, State, and local standards for water well abandonment.  If these standards do not exist, the holder shall follow applicable standards issued by the ASTM, AWWA, or NGWA.  At least 30 days prior to initiation of well decommissioning, the holder shall submit a well decommissioning plan to the Authorized Officer.  The well decommissioning plan must have written approval from the Authorized Officer before well decommissioning commences.  All documentation of well decommissioning shall be provided to the Authorized Officer within 60 days of completion of the work.

## H. WATER FACILITIES AND WATER RIGHTS (D-25).

This permit does not confer any water rights on the holder. Any necessary water rights must be acquired by the holder in accordance with State law. Any expenses for acquiring water rights shall be the responsibility of the holder. The United States reserves the right to place any conditions on installation, operation, maintenance, and removal of facilities to pump, divert, store, or convey water on National Forest System lands covered by this permit that are necessary to protect public property, public safety, and natural resources on National Forest System lands in compliance with applicable law. The holder waives any claims against the United States for compensation in connection with imposition of any conditions on installation, operation, maintenance, and removal of water facilities under this permit.

## I. FIRE-CONTROL PLAN (F-20).

The holder shall prepare a fire plan for approval by the Authorized Officer which shall set forth in detail the plan for prevention, reporting, control, and extinguishing of fires on the authorized areas and within the holder's area of responsibility defined on an attached map. Such plans shall be reviewed and revised at intervals of not more than three (3) years.

## J. IMPROVEMENT RELOCATION (X-33).

This authorization is granted with the express understanding that should future location of United States Government-owned improvements or road rights-of-way require the relocation of the holder's improvements, such relocation will be done by, and at the expense of, the holder within a reasonable time as specified by the Authorized Officer.

## K. COMMUNICATION SITE - EQUIPMENT INTERFACE (X-51).

The holder shall ensure that the holder's equipment operates in a manner which will not cause harmful interference with the operation of existing equipment at or adjacent to the communications site identified in this permit. If the Authorized Officer or authorized FCC official determines that the holder's use interferes with existing equipment, the holder shall promptly take the necessary steps to eliminate or reduce the harmful interference to the satisfaction of the Authorized Officer or FCC official.

## L. ROAD MAINTENANCE (From FS-7700-41). When maintenance is performed, it shall be conducted in accordance with the following requirements and the requirements in Appendices C and D:

12

Initials

1. The holder shall perform maintenance on the roads authorized by this permit that is necessary to protect and repair the roadbed, road surface, and associated transportation facilities.

2. If other commercial users are operating on the roads authorized by this permit, the holder and those commercial users shall enter into an agreement for performance of maintenance on these roads. If conflicts arise regarding responsibility for the maintenance, commercial use on these roads shall cease until the conflicts are resolved.

**THIS PERMIT IS ACCEPTED SUBJECT TO ALL ITS TERMS AND CONDITIONS.**

**BEFORE ANY PERMIT IS ISSUED TO AN ENTITY, DOCUMENTATION MUST BE PROVIDED TO THE AUTHORIZED OFFICER OF THE AUTHORITY OF THE SIGNATORY FOR THE ENTITY TO BIND IT TO THE TERMS AND CONDITIONS OF THE PERMIT.**

ACCEPTED:

LARRY LAWRENCE, NATURAL RESOURCES MANAGER                SIGNATURE                    August 24, 2018
NESTLE WATERS NORTH AMERICA, INC.                                                              DATE

APPROVED:

Joseph Rechsteiner, District Ranger                SIGNATURE                    8/24/2018
USDA, SAN BERNARDINO NATIONAL FOREST                                              DATE

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond, to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0596-0082. The time required to complete this information collection is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

The U.S. Department of Agriculture (USDA) prohibits discrimination in all its programs and activities on the basis of race, color, national origin, age, disability, and, where applicable, sex, marital status, familial status, parental status, religion, sexual orientation, genetic information, political beliefs, reprisal, or because all or part of an individual's income is derived from any public assistance. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's TARGET Center at 202-720-2600 (voice and TDD).

To file a complaint of discrimination, write USDA, Director, Office of Civil Rights, 1400 Independence Avenue, SW, Washington, DC 20250-9410 or call toll free (866) 632-9992 (voice). TDD users can contact USDA through local relay or the Federal relay at (800) 877-8339 (TDD) or (866) 377-8642 (relay voice). USDA is an equal opportunity provider and employer.

The Privacy Act of 1974 (5 U.S.C. 552a) and the Freedom of Information Act (5 U.S.C. 552) govern the confidentiality to be provided for information received by the Forest Service.

13

Initials



Telemetry Station (1)
Vault (2)

Helispot (1)
Telemetry Station (1)
Tunnel #2
Vault (1)

Bridge (1)
Telemetry Station (1)
Tunnel #3
Vault (1)

Helispot (1)
Well #: 10, 11, 12
Bridge (1)
Telemetry Station (1)
Telemetry Pad (1)
Vault (1)

Helispot (1)

Trail

Helispot (1)
Well #: 7, 7A, 7B, 7C
Telemetry Station (1)
Vault (1)

The Permit Area covers 4.51 acres or 6.5 miles in Sec. 30,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 31,
T. 2 N., R. 3 W., SAN BERNARDINO MERIDIAN, Sec. 6,
T. 1 N., R. 3 W., SAN BERNARDINO MERIDIAN,
SE1/4SE1/4 Sec. 1, T. 1 N., R. 4 W., SAN BERNARDINO
MERIDIAN, NE1/4 Sec. 12, T. 1 N., R. 4 W.,
SAN BERNARDINO MERIDIAN

| Use | Code | Acres | Description |
|---|---|---|---|
| Water Trans. Pipeline (4.6 mi) | 915 | 2.8 | 5 ft. wide |
| Access Trails (1.9 mi.) | 753 | 1.4 | 6 ft. wide |
| Helicopter Landing | 715 | 0.25 | 30 ft. radius |
| Wells/Vaults/Telemetry Sta. | 931 | 0.06 | 5 sq. ft |

# Appendix A
## The Permit Area
### Nestle Waters of America
Permit #: FCD728501

San Bernardino National Forest
Front Country Ranger District

October 3, 2017
1:24,000

0      ¼      ½ Mile

▲ Well (12)          ■ Telemetry Station (5)
● Helispot (4)       ■ Telemetry Pad (1)
● Tunnel (2)         — Pipeline
● Valve (27)         ▬ Bridge (20)
● Vault (8)          —•— Trail

**APPENDIX B**
**Resource Mitigation Measures, Monitoring, and Adaptive Management Requirements from the Decision Memo**

**Mitigation Measures** –Permit Sections V and VIII contain standard and supplemental provisions for resource mitigation that cover compliance with environmental laws, and protection of water quality, esthetics, and threatened, endangered and sensitive species habitat. These sections of the permit also include requirements that Nestlé will follow if there is an unanticipated discovery of archeological or paleontological resources, or human remains, funerary objects, sacred objects, or objects of cultural patrimony.  Supplemental standard clauses are also included to require a Fire Control Plan and an Invasive Plant Species Prevention and Control Plan.  The Operating Plan required by permit section III C will include implementation details of how Nestlé will comply with the permit terms and the required resource mitigation measures.  Nestlé will submit the Operating Plan within 60 days of permit issuance and implement the Operating Plan within 30 days of Forest Service approval.  Resource mitigation measures developed by the Forest Service in accordance with the Federal Land Planning and Management Act (FLPMA) and the LMP during the development of the proposed action and in response to scoping and environmental review include:

- The appropriate site-specific National Best Management Practices (BMPs) for the protection of water quality (USDA USFS, FS-990a, April 2012) will be applied to the operation and maintenance of the pipeline, helispots, trails, roads, etc. such as those BMPs in the Facilities and Nonrecreation Special Uses Management Activities, Operations in Aquatic Ecosystems, Water diversions and conveyances, and Road Management Activities categories.
- Maintain a Limited Operating Period (LOP) for the protection of least Bell's vireo (March 15 through September 15) and southwestern willow flycatcher (May 1 to August 31), both federally listed species, during the breeding season for any disturbance related activities within ¼ mile of suitable habitat.
- Maintain a limited operating period (LOP) prohibiting activities within approximately .25 miles of a California spotted owl nest site (US Forest Service sensitive species), or activity center where nest site is unknown, during the breeding season (February 1 through August 15), unless surveys confirm that the owls are not nesting.
- Nestle will install suitable shut-off valves or other flow control devices to ensure that water will not be extracted in excess of the holders ability to store or transport water without waste or spillage from local storage.  This requirement will be implemented within 30 days of Forest Service approval of the Operating Plans.
- Maintain minimum flows in two locations as described in the Adaptive Management Plan as follows:
  - Lower spring complex (10, 11, 12) - 20 gallons per minute (gpm) in the drainage area A tributary of Strawberry Creek immediately above the confluence of drainage area A and B as defined in URS 2002.  Drainage area A is the watershed influenced by the water extraction.
  - Borehole complex 1, 1A, and 8 – 6.25 gpm as measured at water right A6108.
- Install, supply water to, and maintain two wildlife "drinkers", one in the vicinity of tunnels 2 and 3, and the other near the well 7 complex.  Plans for these features will be

submitted to the authorized officer for approval prior to installation.
- Continue the addition of water (irrigation) to support success of native special status vegetation and provide for wildlife habitat linkages if determined that less than 70% of expected aquatic life forms and communities are present based on riparian studies.
- Implement actions identified in the AMP, such as to maintain surface water flow to support macroinvertebrate populations and riparian vegetation, to determine if benthic macroinvertebrate (providing base of food chain to riparian dependent wildlife resources): diversity and abundance supported by base flows measured in East Twin Creek control watershed are not maintained at the 70% level by the 6.25 gpm and 20 gpm initial minimum flows in the diversion subwatershed
- Implement actions identified in the AMP, such as the direction to conduct a paired watershed study to assess the riparian health of East Twin Creek compared to the subwatershed of Strawberry Creek where the extraction points are located.  Multiple paired study locations may be used to look at different parts of the watershed. Define current riparian/stream health in each watershed at all comparison study reaches to determine if native vegetation is vigorous, healthy and diverse in age, structure, cover and composition on <75% of the riparian/wetland areas in the diversion subwatershed where extraction is taking place compared to the East Twin Creek control area.
- Trash shall be removed daily during all on-site activities for the protection of wildlife.
- Provide an annual Project Aviation Safety Plan to the SBNF Unit Aviation Officer (UAO) as part of the Annual Operating Plan for approval.  The Plan should include: i) Aircraft company/pilot contact information, ii) Radio Frequencies, iii) Schedule of proposed flights, iv) Base of operations and proposed flight routes in/out of watersheds, v) Emergency protocol for mishap.
    - Provide Notification to Permit Administrator and UAO **two weeks prior to any flight** in order to:  i) Determine if Limited Operating Period (LOP) is needed for nesting/ breeding bird season for flycatcher/vireo if determined to be present during the permit period, ii) Avoid any concerns with other flights in area – de-conflict airspace if needed, ii) Provide FICC/dispatch with information to track flight if needed during fire season.
    - Communicate with FICC/dispatch the day of any flight to ensure positive radio communication with dispatch over assigned frequency at beginning of day/flights into area and to close out last flight/exit from area at end of day.
- The authorized officer will approve final locations for any helispots and access routes developed for monitoring in East Twin Creek.  Pre-work resource surveys will be conducted if required by the authorized officer.
- Special status plants and wildlife species:
    - If occurrences of FS Sensitive or Federally listed plant or wildlife species are found at any time within the project area, they will be reported to the Forest Service immediately. New mitigation measures may be developed with input from appropriate specialists, and USFWS (if federally listed species are found). Mitigation measures will be implemented by the project proponent for all activities that may affect the identified occurrences.
- Invasive Plant Species Management
    - All off-road equipment will be cleaned **prior to entering NFS land**. The cleaning measures must be practical, verifiable, and not cause other unacceptable

environmental problems.  Depending on the nature of the debris, the equipment may be cleaned using water or mechanical methods (brushing, scraping, prying), compressed air, high-pressure water, or steam. This includes wheels, tires, buckets, stabilizers, undercarriages and bumpers.

o  All gravel, fill, erosion control or other materials are required to be weed-free and subject to review and approval by the Forest Service line officer with input from appropriate resource specialists.

o  Use only weed-free equipment, mulches, and seed sources.  Salvage topsoil from project area for use in onsite revegetation, unless contaminated with weeds.  All activities that require seeding or planting must utilize locally collected native seed sources when possible.  Plant and seed material should be collected from or near the project area, from within the same watershed, and at a similar elevation when possible.  This requirement is consistent with the USFS Region 5 policy that directs the use of native plant material for revegetation and restoration for maintaining "the overall national goal of conserving the biodiversity, health, productivity, and sustainable use of forest, rangeland, and aquatic ecosystems." Seed mixes must be approved by a Forest Service botanist.

o  Minimize the amount of ground and vegetation disturbance during construction and maintenance.

o  A weed management plan will be prepared in cooperation with the Forest Service for survey, prevention, reporting, controlling and monitoring weed populations in the project area. The plan will be included in the Adaptive Management Plan.

o  Take action as described in the weed management plan if the cover, quantity or extent of current infestations are increasing, or new invasive species are identified.

**Hydrologic and Riparian Studies** – Under the new permit, Nestlé will conduct hydrologic and riparian studies to better understand the relationship between water extraction, surface flows, and riparian habitat in order to ensure that water extraction is consistent with the LMP standards. The initial studies provided by the permittee suggest that water extraction is reducing surface flow in Strawberry Creek.  The effect of this flow reduction has not been thoroughly studied. The permittee will study comparison sites in adjacent unmanaged drainages to determine what conditions would exist in Strawberry Creek without water extraction in the upper watershed. This approach is typically referred to as a "paired basin" study.  This study will also be used to support the Adaptive Management Plan.

The permittee will consult with the Forest Service in the development of the study plan, and will submit a draft study plan to the Forest Service for approval within 30 days of permit issuance. The permittee will implement the plan within 30 days of Forest Service approval.  The study period is expected to last for a minimum of three years.

The study plan will incorporate the use of "test flows" to determine the response of the streams to reduction in water extractions.  These "test flows" may involve suspending extraction for set time periods to evaluate any changes in streamflow. The study plan will also include an analysis of the full hydrograph and evaluate the change in the annual hydrograph from project operations. The studies will include isotope studies/chemical analysis of the extracted water to determine water source and other characteristics.

**<u>Adaptive Management Plan</u>** (AMP) – The permittee will implement an Adaptive Management Plan to ensure that resource mitigation measures are met, which ensure that effects to natural resources and water extraction activities are consistent with San Bernardino National Forest LMP standards as required by the National Forest Management Act (NFMA).  Adaptive management provides an implementation tool that incorporates an "implement-monitor-adapt" strategy that provides flexibility to respond to monitoring information that indicates that desired conditions are not being met.  If monitoring demonstrates that the intended effects are not being achieved through the initial management action, the action can be modified using one or more of the adaptive management actions to achieve the intended effects.  Each component of the Adaptive Management Plan would include:

1) A Forest Plan objective (standard, requirement, handbook)

2) A monitoring scheme to assess if the objective is being met

3) Trigger point(s) where the Forest Plan objective is not being met

4) Action(s) to meet Forest Plan objective(s)

5) Monitoring to assess success of mitigation and restoration

The Final Adaptive Management Plan outline included in the Decision Memo is attached to this Appendix.  The permittee will develop the implementing details of the Final Adaptive Management Plan using the outline in consultation with the Forest Service and will submit the detailed AMP to the Forest Service for approval within 30 days of permit issuance, unless the authorized officer extends the time for submission.  The permittee will implement the plan within 30 days of Forest Service approval.  The Adaptive Management Plan will be active for the term of the permit, and may be amended based on the results of the paired basin studies described above.

For the purposes of permit compliance, the streamflow triggers described in the Final AMP outline are considered minimum flow requirements that must be met before water extraction can occur.  Those triggers have been incorporated into the resource mitigation measures described above.

**Appendix 1**
**Nestlé Waters North America Inc.**
**Special Use Permit**
**Final Adaptive Management Plan Outline (AMP)**

The Adaptive Management process includes a:

6) Forest Plan objective (standard, requirement, handbook)

7) Monitoring to assess if the objective is being met

8) Trigger point(s) where Forest Plan objective(s) is not being met

9) Action(s) to meet Forest Plan objective(s)

10) Monitoring to assess success of mitigation and restoration

This final AMP is intended to meet San Bernardino NF LMP requirements and standards as part of the permit when issued.  Nestlé is expected to provide detailed information on implementing the AMP, which will be approved by the Forest Service.

## Objective 1    Water Standards

1) **LMP, Part 3, S46**: Surface water diversions and groundwater extractions, including wells and spring developments will only be authorized when it is demonstrated by the user, and/or agreed to by the Forest Service, that the water extracted is excess to the current and reasonably foreseeable future needs of forest resources.

2) Monitoring components

   a. Determination of safe yield (water balance) in the subwatershed containing the extraction points:

      i. Inputs: Precipitation gaging, groundwater inflow, infiltration

      ii. Outputs: Evapotranspiration gaging, overland flow, surface water outflow, groundwater outflow including extraction

      iii. Build a gridded surface water-groundwater model and calibrate it with collected data including structural geology (e.g. faults) components

         1. Building and calibrating a fractured mountain-front hydrogeologic model is a longer term goal given the lack of baseline data and the multiple parameters needed

   b. Water quality testing to maintain compliance with Clean Water Act Basin Plan

      i. 475 mg/L TDS

   c. Maintenance of surface water flow to support macroinvertebrate populations and riparian vegetation

   d. The 2002 and 2015 studies showed that the stream reach below Wells 10, 11, 12 was dry and didn't support macroinvertebrate populations. The goal is to reduce extraction until the desired condition (riparian vegetation and macroinvertebrate populations similar to the paired watershed) is achieved. Stream Condition data

has yet to be collected in stream reaches below Wells in complex 7 and below the cluster of wells/springs 1, 1A, 8, and the FS Spring, and tunnels 2 and 3.

e. Provide drinking water for wildlife at two locations as specified in the Resource Mitigation Measures.

3) Triggers:

a. Flows as specified will be maintained in two (2) locations as follows:

i. Lower spring complex (10, 11, 12) - 20 gallons per minute (gpm) in the drainage area A tributary of Strawberry Creek immediately above the confluence of drainage area A and B as defined in URS 2002. Drainage area A is the watershed influenced by the water extraction.

ii. Borehole complex 1, 1A, and 8 – 6.25 gpm as measured at water right A6108.

b. These flows are established as initial minimum flows. Nestlé must manage extraction to maintain those minimum flows.

i. Flows below the required minimum flows indicate that surface flow is trending towards too dry and that there is no water in excess of the needs of forest resources and therefore there is no water available for extraction.

ii. As future data is collected these trigger points can change if monitoring shows the need for adjustment.

4) Actions:

a. When trigger a.i or a.ii. is reached, reduce or stop extraction for Wells/Springs based on closest diversion point to measurement reach:

i. Water Right A6108 is in closest proximity to boreholes 1, 1A, 8, which will need to be shut-in, potentially seasonally, to provide for the 6.25 gpm.

ii. The 20 gpm minimum requirement is hypothesized to be directly affected by extraction at boreholes 10, 11, 12, and indirectly by tunnels 2, 3 and boreholes 7, 7A, 7B, 7C.

iii. As the hydrogeology becomes better understood (travel times, groundwater/surface water connections), reduction of extraction from the appropriate sources can be better identified

b. If the initial actions do not maintain minimum flows, all extraction must cease until flows reach minimum levels required to meet hydrological and biological concerns

5) Monitoring:

a. Trigger a.i and a.ii

i. Monitor flow at least bimonthly to ensure minimum flow levels are met.

ii. Emphasize more frequent monitoring intervals as flow levels approach the minimum flow levels, or less if minimum levels are exceeded over a longer period, such as winter/wet season conditions

      iii.   Monitor flows with recording hydrographs to capture diurnal fluctuation

      iv.   Track groundwater recovery (i.e pressure transducers, piezometers) between spring locations and surface water drying location(s)

      v.   Measure travel time through the system

      vi.   Measure water quality parameters

      vii.   Track groundwater recovery

## Objective 2  - Riparian Standards

1) **LMP, Part 3, S47:** When designing new projects in riparian areas, apply the Five-Step Project Screening Process for Riparian Conservation Areas as described in Appendix E - Five-Step Project Screening Process for Riparian Conservation Areas. Activities are designed to protect, maintain, or restore the riparian ecosystem. In the riparian conservation areas that include perennial and intermittent streams, lakes, and wetlands allow only those actions that maintain or improve long-term aquatic and riparian ecosystem health including quantity, quality, and timing of stream flows. As part of the analysis consider physical factors, such as soil characteristics, groundwater and surface water characteristics, geology and geologic hazards, slope, and stream characteristics; and biological factors, such as aquatic and riparian dependent species present, their habitat needs (see species guidance documents in Part 3, Appendix H), and the ability of the existing environment to provide needed habitat. [Strategy WAT 1 includes RCA language and "Restore, maintain and improve watershed conditions over the long-term."]

2) Monitoring components – determine potential of riparian ecosystem for restoration purposes

   a.   Conduct a paired watershed study to assess the riparian health of East Twin Creek compared to the subwatershed of Strawberry Creek where the extraction points are located. Multiple paired study locations may be used to look at different parts of the watershed. Define current riparian/stream health in each watershed at all comparison study reaches.

      i.   Since the 2002 and 2015 studies noted that the creek was dry below the geologic fault near Wells 10, 11, 12, set one monitoring location transect and channel length in East Twin Creek based on elevation and lateral extent of geologic fault structures (this could occur near the H1 bird survey area, Figure 7, Bio technical report)

      ii.   Additional comparison reach locations should coincide with elevation, faulting, geomorphology, etc for extraction locations 1, 2, 3, 7, 8 spring/well groupings.

      iii.   Use a modified stream condition inventory/proper functioning condition (SCI/PFC) protocol to gather geomorphology, plant physiology, extent of riparian vegetation (including native mid to late seral stage), condition of the channel, stream characteristics, flow, water quality, macroinvertebrate diversity, stream hydrograph, precipitation, geologic structural controls on flow, etc

    iv.  Use standard forest inventory plot measurements to monitor condition of riparian vegetation, including seral stage, tree density, regeneration, mortality, species composition, and cover

    v.  Determine improvement in habitat suitability from increased flow rate in drainage by using protocol standards established for southwestern willow flycatcher, Least bell's vireo, California gnatcatcher, Santa Ana speckled dace, and mountain yellow-legged frog in year 2 and year 4 (if the permit is reissued).  If the permit is reissued for year 5, conduct protocol presence surveys for the listed species to determine any occupancy.

    vi.  Conduct comparison of upper reaches of East Twin Creek at same elevation points in watershed as well sites/monitoring stretches in Strawberry Creek

3) Triggers:

a. The magnitude, duration, and/or timing of annual extreme flows (low/base and/or high) significantly depart from the natural hydrograph measured in East Twin Creek paired watershed.  [Indicates an Impaired rating for Flow Characteristics under Watershed Condition Classification protocol.]

b. Benthic macroinvertebrate (providing base of food chain to riparian dependent wildlife resources): diversity and abundance supported by base flows measured in East Twin Creek control watershed are not maintained at the 70% level by the 6.25 gpm and 20 gpm initial minimum flows in the diversion subwatershed. [Indicates an Impaired rating for Life Form Presence under Watershed Condition Classification protocol.

c. More than 75% of diversion subwatershed channel length has width-to-depth ratios greater than the East Twin Creek control area. [Indicates an Impaired rating for Channel Shape and Function under Watershed Condition Classification protocol.]

d. Native vegetation is vigorous, healthy and diverse in age, structure, cover and composition on <75% of the riparian/wetland areas in the diversion subwatershed where extraction is taking place compared to the East Twin Creek control area. [Indicates an Impaired rating for Riparian Vegetation under Watershed Condition Classification protocol.]

4) Actions:

a. Reduce extraction from springs/boreholes whose travel time connectedness allows for magnitude, duration, and/or timing of base flow to be maintained. (This level of flow could be different than minimum under Objective 1 triggers.)

b. Reduce extraction from springs/boreholes to provide sufficient water to support benthic macroinvertebrate diversity and abundance at a level greater than 70% of that measured in the East Twin Creek control watershed.

c. Reduce extraction from springs that affect groundwater depth within the riparian zone to allow groundwater to rise to the rooting depth of the riparian dependent vegetation.

       d. Reduce extraction to allow for vegetation to reach a sustained level of 75% area of vigorous, healthy and diverse in age, structure, cover, and composition as described by the Watershed Condition Classification standards.

5) Monitoring:

       a. Base flow maintenance levels are to be maintained and measured in the low flow periods until sufficient fall/winter rainfall raises the level to a non-base flow level based on gaging in control watershed.

       b. Benthic macroinvertebrate diversity and abundance will be measured in Strawberry Creek and the control watershed of East Twin Creek at the same time (same day or week).  Data should be collected at strategic time intervals and locations with appropriate protocols, avoiding taking data immediately following scouring flows, and matching the substrate, spatial, and lateral components of the control watershed and focusing on riffles rather than runs or pools.

       c. Shallow groundwater monitoring piezometers (with data loggers) set back from the channel to either side within the riparian corridor to measure wetted depth for supporting riparian vegetation.

       d. Monitor riparian vegetation health across the lateral extent of the survey reaches using vegetative health indicators, determined through consultation with Forest Service specialists, until threshold is reached. Track water needs to reach this level and maintain reduced extraction levels seasonally to maintain this level of vegetative health.

## Objective 3 – Species Standards

1) **LMP, Part 3, S11:** When occupied or suitable habitat for a threatened, endangered, proposed, candidate or sensitive (TEPCS) species is present on an ongoing or proposed project site, consider species guidance documents (see Appendix H) to develop project-specific or activity-specific design criteria. This guidance is intended to provide a range of possible conservation measures that may be selectively applied during site-specific planning to avoid, minimize or mitigate negative long-term effects on threatened, endangered, proposed, candidate or sensitive species and habitat. Involve appropriate resource specialists in the identification of relevant design criteria and appropriate species lists. Include review of species guidance documents in fire suppression or other emergency actions when and to the extent practicable.

    **LMP, Part 3, S24**: Mitigate impacts of on-going uses and management activities on threatened, endangered, proposed, and candidate species.

2) Monitoring components – determine potential of micro-riparian habitats from untapped springs and meadows to be used as reference point for determining restoration potential in Strawberry Creek watershed

       a. Investigate East Twin Creek to find un-tapped springs, and seeps both in upper areas (elevations similar to diversions) and lower down (where increased groundwater pressure could be maintaining these features)

           i. Document lateral/spatial extent of riparian vegetation and TEPCS plants and wildlife on bi-yearly interval, years – 2 and 4 of permit

      ii.   Measure rooting depth

      iii.  Measure groundwater levels

      iv.  Conduct presence/absence surveys for special status wildlife and plant species identified with habitat present; years 2 and 4 of permit.

      v.   Identify spring discharge and surface water extent

          1.  Set movement cameras to document use of surface water by animals – monitoring for 1 week in spring, summer and fall quarters

  b.  All types of monitoring in control watershed must be duplicated in diversion sub watershed.

3) Triggers:

  a.  From 70% to 90% of expected aquatic life forms and communities are present based on the potential found in the East Twin Creek watershed. [Indicates a Functioning at Risk rating for Life Form Presence under Watershed Condition Classification protocol.]

  b.  Less than 70% of expected aquatic life forms and communities are present based on the potential found in the East Twin Creek watershed. [Indicates an Impaired rating for Life Form Presence under Watershed Condition Classification protocol.]

4) Actions:

  a.  Using water from the spring/well diversion sites, increase water flow to create areas for restoration of riparian vegetation and/or to provide wildlife drinkers or for wildlife drinkers – this can be achieved by providing bypass/pressure release valve, spring box plumbed from site, or other mechanism approved by FS.

  b.  Continue the addition of water (irrigation) to support success of native special status vegetation and provide for wildlife habitat linkages.

5) Monitor restoration of plant and animal communities on bi yearly basis.

## Objective 4 – Invasive Species Standards

1) **LMP Part 1. Goal 2.**1 Reverse the trend of increasing loss of natural resources due to invasive species. Forest Service Manual direction for Invasive Species Management is contained in FSM 2900, effective December 5, 2011.  This direction sets forth National Forest System policy, responsibilities, and direction for the prevention, detection, control, and restoration of effects from aquatic and terrestrial invasive species.

2) Monitoring components – identify, quantify, and map existing occurrences of priority invasive plant and animal species within the project area and document with GIS polygon shapefiles or GPS coordinates.

  a.  The priority invasive plant and animal list is to be based on species that are included in Cal IPC list of species considered to be High and Medium threat to ecological systems, and are not already ubiquitous throughout both the project

area and the paired watershed of East Twin Creek. This list will be compiled in consultation with USFS botany and wildlife specialists.

    b.  All types of monitoring in control watershed must be duplicated in extraction watershed

3) Triggers:

    a.  Cover, quantity or extent of current infestations are increasing.

    b.  New invasive species are identified.

4) Actions:

    a.  Consult with USFS botany and biology specialists to determine most effective control/eradication methods allowed by agency policy and direction.

    b.  Initiate control as soon as possible within the time period for most effective treatment.

    c.  Remove biomass containing reproductive potential (root segments, seeds, or flowers that could develop into viable seed) from project site and FS land.

    d.  Remove adult, juvenile or larval forms of animals from project site and NFS land.

    e.  Provide yearly report of monitoring and control efforts including names of workers/surveyors, date, method of control, and location.

5) Monitor and re-treat when necessary to control or eradicate identified invasive plant and animal infestations.

**APPENDIX C**
**ROAD MAINTENANCE REQUIREMENTS**

<u>SECTION 810 – SURFACE BLADING</u>

DESCRIPTION

<u>810.01</u>

This work consists of blading native surface roads to a condition to facilitate vehicle traffic and provide proper drainage.  Blading includes shaping the crown or slope of traveled way, berms, leadoff ditches, and drainage dips in accordance with this specification.

REQUIREMENTS

<u>810.02</u>

Surface blading operations shall not extend beyond 2 miles at one time per machine.  Berms resulting from surface blading operations shall be removed from the traveled way and turnouts and incorporated uniformly into existing berm prior to the end of the days work.

<u>810.03 General</u>

The existing traveled way and shoulders, including turnouts unless otherwise ordered, shall be bladed and shaped to produce a surface which is uniform, consistent to grade, and crowned or cross sloped as indicated by the character of the existing surface.  Roadway width in excess of the traveled way shall be shaped only as needed to provide drainage away from the traveled way.  Established grasses and other vegetation shall not be removed from the excess width except as incidental to providing drainage or unless otherwise provided in the contract.

Surface irregularities, including ruts up to 12 inches in depth, shall be eliminated and the surface shall be left in a smooth and free draining state.  The degree of smoothness shall vary depending on the availability of cushion material.  The traveled way, shoulders, and turnouts shall be free draining upon completion of work in this section.

Ruts over 2 inches but not exceeding 12 inches in depth shall be scarified to the full depth of the rut.  Ruts exceeding 12 inches in depth shall be treated as described in Section 814, Reshape Traveled Way.  The scarified area shall then be wheel rolled with heavy equipment to compact the disturbed area.  Surface blading shall then resume over this area as described in section 810.03.

Existing native, rock or aggregate surfaced drainage dips shall be shaped incidental to blading to divert surface runoff to existing outlet devices, ditches and discharge locations.  Leadoff ditches shall be opened to drain.

The Contractor shall establish a blading pattern which provides a uniform driving surface, retains the surfacing on the roadbed and provides a thorough mixing of the materials within the completed surface width.  Suitable material generated from backslope sloughing and ditch cleaning shall be blended with the surface material being worked.  Berm material may be used for the purpose of surface blading when the berm is in excess of 2 feet in width.  If berm material is used, only that material in excess of the 2 feet in width may be used.

Upon final blading, no disturbed rock shall protrude more than FOUR (4) inches above the adjacent surface.  Material not meeting this dimension shall be removed and placed outside the roadbed so as not to obstruct drainageways or structures.

810.04 Compaction

Disturbed areas shall be compacted by operating heavy equipment over loose materials.

810.05 Undercutting

Roadway backslope shall not be undercut.

810.06 Cleaning of Structures

Materials resulting from work under this section shall not be allowed to remain on or in structures, such as bridges, culverts, cattleguards, drainage dips, aprons, or flumes.  Removal shall not be measured for payment and shall be considered incidental to work in this section.

Materials deposited in culverts, drainage aprons, and flumes by other than contractor's operation, requiring removal of less than one (1) cubic yard of material shall be cleaned and considered incidental to this item of work.  Drainage structures requiring removal of more than 1 cubic yard of material, including foreign and vegetation, shall be cleaned and paid for in accordance with Section 831, Drainage Structure Cleaning.

810.07 Berms

Existing berms shall be maintained to the condition of adjacent segments.  Breaches in earth berms shall be repaired using suitable material derived from blading operations.

810.08 Drainage Dips

All foreign material deposited in drainage dip flowline as a result of natural sloughing or blading operations shall be removed with heavy equipment equipped with tilting blade to ensure a smooth transition of flowline from backslope or previously established flowline of travel way to drainage structure, drainage ditch or natural drain. Excess material may be incorporated into the traveled way when suitable.

**APPENDIX D**
**OPERATING PLAN for**
Road Grading of 1N24
Nestlé Waters North America

## PROPOSED ACTION

The scope of this operating plan involves grading and maintaining Forest Road 1N24 from the Forest Boundary to Strawberry Creek on an as needed basis. This forest road is used by Nestlé to service and maintain the water pipeline that is authorized under this special use permit.

## DESIGN CRITERIA

General
- Notify the Forest Service prior to the start of work.
- Obtain a burn permit from the Forest Service prior to conducting any road grading, cutting, grinding, or welding activities. Current Forest Service fire restrictions will be followed in accordance with project activity levels (PAL) for the local area of work. **The burn permit may be obtained by calling the designated Fire Patrol.**
- Vehicle travel off Forest Development Roads is not authorized at any time during maintenance activities of this type. All vehicles are to be parked on pre-disturbed areas near and around the replacement locations.  No new motorized vehicle access routes will be created.
- No vegetation removal is authorized.
- Refueling of equipment and storage of fuel and other hazardous materials will not occur within 100 meters of Riparian Conservation Areas (perennial and seasonal streams, seeps, springs, and meadows).
- You must check for gas pipelines prior to grading and have those locations marked for avoidance.
- Upon completion of the project, all unused materials and equipment will be removed from the site.

Cultural
- Because there is high archaeological sensitivity at two sites on 1N24 for about ½ mile, an archaeological monitor must be present when work is done on 1N24. **Call the permit administrator to schedule this monitor as far in advance of road work as possible.**
- If cultural materials are uncovered during project implementation, federal and state laws require work be stopped immediately in that area until an archeologist can evaluate the findings and provide additional protection measures or mitigate the impacts.

Biological/Botanical

- There is a Limited Operating Period (LOP) for two federally listed endangered species, southwestern willow flycatcher and least Bell's vireo, wherever work is expected to occur within 500 feet of mapped habitat. We will provide you with a map of these areas. LOP for willow flycatcher is May 1 - August 31; LOP for the vireo is March 15 - September 15.  Work cannot be conducted in the mapped LOP areas unless work can be completed within the LOP area in 2 hours or less per day.  If you choose to operate in a mapped LOP, a Forest Service biological monitor must be on site to verify that work in these areas does not exceed 2 hours per day. **Call**

3

**the permit administrator to schedule this monitor as far in advance of road work as possible.**

- There will be no LOP for California spotted owl if work is completed prior to the start of owl breeding (February 1). If work will be done later than February 1, contact the project coordinator for authorization.
- All work should be conducted during daylight hours, without the use of artificial lighting (one half hour after sunrise and one half hour prior to sunset).
- Avoid any activities that could cause sedimentation in either Twin Creek or Strawberry Creek.
- Since Spanish Broom, an invasive plant species, is present at the northeast end of 1N24, operate equipment from the southwest to the northeast. Clean blade, tires, and undercarriage of equipment thoroughly with compressed air, and/or hand tools after working in Spanish broom infested area. This should be done within the infested area prior to moving the equipment to other areas.

## Standard Best Management Practices (BMPs)

### 13. Erosion Prevention and Control Measures (PRACTICE: 1-13)
a. Objective: To ensure that operations will be conducted reasonably to minimize soil erosion.

b. Explanation: Contractors must understand and adhere to water quality BMP prescriptions.

c. Implementation: Equipment will not be operated when ground conditions are such that excessive damage will result. The kinds and intensity of control work required of the contractor will be adjusted to ground and weather conditions with emphasis on the need to control overland runoff, erosion, and sedimentation. Erosion control work will be kept current. At certain times of the year this means daily, if precipitation is likely, or at least weekly when precipitation is predicted for the weekend.

## ROADS:
The following are the BMPs for the control of non-point source pollution associated with road and building site construction activities. Each BMP was formulated based on the administrative directives that guide and direct the Forest Services' construction and maintenance of roads, buildings, and administrative facilities on NFS land.

### 11. Control of Sidecast Material During Construction and Maintenance (PRACTICE: 2-11)
a. Objective: To minimize sediment production originating from sidecast material during road construction or maintenance.

b. Explanation: Unconsolidated materials including rocks and boulders that are cast over the side of the road shoulder can roll directly into streams, damage downslope vegetation and create bare areas that are difficult to stabilize with vegetation. Where soil does not directly reach a stream, it is still highly susceptible to erosion, dry ravel and mass instability, and subsequently can directly deliver sediment to a nearby stream. Site-specific limits and controls for side casting or end hauling are developed and documented during environmental analysis. Loose, unconsolidated sidecast material must not be permitted to enter SMZs, (see Practice 2-17).

During road maintenance operations, potential sidecast and other waste material will be utilized on the road surface or removed to designated disposal sites.

**Servicing and Refueling of Equipment (PRACTICE: 2-12)**

a. Objective: To prevent pollutants such as fuels, lubricants, bitumens and other harmful materials from being discharged into or near rivers, streams and impoundments, or into natural or man-made channels.

b. Explanation: During servicing and refueling of road construction equipment, any spilled pollutants can be transported by runoff to surface waters. If the volume of fuel exceeds 660 gallons in a single container, or if total storage at a site exceeds 1,320 gallons, project Spill Prevention, Containment and Counter Measures (SPCC) plans are required. Contaminated upland soils can be a longterm threat to surface and ground water quality. This threat must be managed by disposing of waste material properly, selecting service and refueling areas well away from wet areas and surface water; by using berms around such sites and by utilizing impermeable liners or other techniques to contain spills according to the Forest SPCC plan.

**Maintenance of Roads (PRACTICE: 2-22)**

a. Objective: To maintain roads in a manner which provides for water quality protection by minimizing rutting, failures, sidecasting, and blockage of drainage facilities all of which can cause erosion and sedimentation, and deteriorating watershed conditions.

b. Explanation: Roads normally deteriorate because of use and weather. This deterioration can be corrected by adequate maintenance and/or restriction of use occasionally new groundwater springs and seeps appear after a wildfire or unusually wet periods and saturate road surfaces. All roads are maintained to at least the following level:

1) Provide the basic maintenance required to protect the road investment and to ensure that damage to adjacent land and resources is prevented.

2) As a minimum measure, maintenance must protect drainage facilities and runoff patterns.